UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
NEW YORK. NEW YORK


## PLAINTIFF'S RESPONSE TO
## DEFENDANT'S MOTION TO DISMISS


**Ni, Ai Ming,**                                        08cv 00385 (LBS) (KNF)
    Plaintiff

v.

**Michael B. Mukasey,**
    Attorney General of the United States;
**Michael Chertoff,**
    Secretary of Homeland Security;
**Kevin Ohlson,**
    Director of the Executive Office for Immigration Review,
    Department of Justice;
**Juan Osuna,**
    Acting Chairman of the Board of Immigration Appeals,
    Department ofJustice;
**David L. Neal,**
    Chief Immigration Judge,
    Executive Office of Immigration Review;
**Emilio Gonzales,**
    Director of the United States Citizenship and hnmigration Services.
    Department of Homeland Security;
**Susan Raufer,**
    Director of the Lynhurst, New Jersey Asylum Office,
    Citizenship and Immigration Services; and
**Robert D. Mueller, III,**
    Director of the Federal Bureau of Investigation,
    Department of Justice.

      Defendants

# I. ARGUMENT

## A. This Court Has Jurisdiction To Consider Plaintiff's Mandamus Action

### 1. With the Exception of the Background Check, the Adjudication of Mr. Ni's Asylum Application Was Complete at the Time of the Conditional Grant.

*a. The DHS concluded its discretionary phase of Mr. Ni's asylum adjudication ended on September 4, 2004.*

The Attorney General or Secretary of Homeland Security have discretion to grant asylum when an alien establishes that he or she qualifies for asylum under the refugee statute and is not otherwise barred:

> The Secretary of Homeland Security or the Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section if the Secretary of Homeland Security or the Attorney General determines that such alien is a refugee within the meaning of section 101(a)(42)(A).

8 USCS § 1158(b)(1).

Although the Attorney General and Secretary of Homeland Security have discretion to grant asylum, they do not have discretion to unduly delay the decision-making process. Congress requires prompt action on the adjudication of asylum applications:

> [I]n the absence of exceptional circumstances, final administrative adjudication of the asylum application, not including administrative appeal, shall be completed within 180 days after the date an application is filed.

8 USCS § 1158(d)(5)(A)(iii).

In Mr. Ni's case, the adjudicatory, decision-making phase of his asylum application ended with the grant of asylum on September 4, 2004. The asylum grant to Mr. Ni was conditioned only on the availability of a visa number and a background check. *See e.g.* EOIR News Release, December 16, 2004 attached as Exhibit 1. The Government has not suggested that there exist any grounds whatsoever to support a motion to reopen Mr. Ni's case for the purpose of terminating the asylum grant. *See* 8 C.F.R. 208.24 (f), *Ntangsi v. Gonzales*, 475 F.3d 1007 (8th Cir. 2007) (Government bears burden of proof in a case reopened for asylum termination). The Government's brief indicates that the Government's failure to remove the condition on Mr. Ni's grant of

asylum is solely due to unspecified delays regarding the background check.
Government's brief at 6 n.2.

> *b.  At the time of the original asylum grant, the removal of the conditions on "CFP" asylum grants was a purely ministerial action, involving no discretion or decision-making.*

Although the Government suggests that the removal of the condition on a grant of asylum based solely on coercive family planning ("CFP") is an integral part of the adjudicatory process, Government's Opening Brief at 8, the removal of the condition on an individual's grant of asylum in fact has never entailed any decision making on the part of the Attorney General, legacy INS, or USCIS personnel.  Prior to 2005, when Congress lifted the annual cap on CFP asylum grants,[1]  the removal of the condition was automatic, as soon as background checks were complete and a visa number became available.  *See e.g. Matter of X-P-T-*, 21 I. & N. Dec. 634, 637 (BIA 1996), USCIS Office Of International Affairs, Asylum Division, AFFIRMATIVE ASYLUM PROCEDURES MANUAL, February 2004 at 49-51, ("2003 Asylum Manual")  attached as Exhibit 2.  The post-grant processing of CFP asylum grants has always been a purely ministerial matter involving the completion of a checklist but no discretionary decision-making whatever.  *See id.*

As the BIA noted in *Matter of X-P-T-,* 21 I. & N. Dec. 634, 637, the Attorney General had discretion to establish the general policy and procedures by which the 1000 annual visa numbers would be made available.  However, the BIA held that once a background check was completed and a visa number available under the policy established by the Attorney General, the condition on a CFP asylum grant must be *administratively* removed.  *Id.*

Further, the USCIS procedures manuals confirm the agency's understanding of the directive implicit in *Matter of X-P-T-:* removal of the condition is automatic when a background check is complete and a visa number is available; no administrative discretion, adjudication, or decision-making is involved.

 According to the 2003 Asylum Manual:

> When an applicant is granted asylum "conditionally," it means that the applicant has met all of the conditions to be granted asylum status; however, s/he cannot receive a final asylum approval because a CFP authorization number is unavailable. . . .  Issuance of the authorization number allows the asylum office to issue a final approval of asylum to the applicant and any qualified dependents included on the application.

*Id.* at 49.

---

[1] *See* REAL ID Act of 2005, Div. B of Pub. L. No. 109-13, § 101(g)(2), 119 Stat. 231, 305.

**2.  In asylum cases, background checks are ministerial and nondiscretionary; the APA requires that the checks be conducted within a reasonable time.**

The "pervasive and serious" problem of a major backlog in background checks for those applying for immigration benefits has long been well known.  *See e.g.* Citizen and Immigration Services Ombudsman Annual Report 2008, June 30, 2008 (attached as Exhibit 3) at 5-7.   In light of the statutory mandate that asylum adjudications must be completed within 180 days, 8 USCS § 1158(d)(5)(A)(iii), background checks in asylum cases either are not part of the adjudicatory process, or DHS is in routine and egregious violation of 1158(d)(5)(A)(iii).  The fact that the 2003 and 2007 Asylum Office procedures manuals treat the completion of the background as merely a task on a ministerial checklist supports the argument that background checks in asylum cases are best seen as ministerial tasks rather than an adjudicative decisions involving agency discretion.  *See* 2003 Asylum Manual at 49-51,  USCIS Office Of International Affairs, Asylum Division, AFFIRMATIVE ASYLUM PROCEDURES MANUAL, November 2007 ("2007 Asylum Manual") (attached as Exhibit 4) at 44 n.1, 55-56.

This is not to say that the Attorney General does not have discretion and decision making authority regarding background checks.  Just as with the policies governing the release of 1000 visa numbers available per year under the old cap on CPF asylum grants,[2]  the Attorney General has discretion to set the policy and procedures by which background checks are conducted, and, indeed has done so.  *See* EOIR Interim Rule on Background and Security Investigations, 70 Fed. Reg. 4743-4754 (2005) *reprinted at* AILA InfoNet Doc. No. 05012861 (posted Jan. 31, 2005).

Additional support for the argument that the background check in CFP conditional grant asylum cases is purely ministerial is found in EOIR's own explanation of its Interim Rule on Background Checks.  There EOIR describes the thorough background check which is required *prior* to any asylum grant:

> The Department notes that current law prohibits the immigration judges from granting asylum to any alien prior to the completion of identity, law enforcement, and security investigations. Section 208(d)(5)(A)(i) of the Act (8 U.S.C. 1158(d)(5)(A)(i)), expressly provides that asylum cannot be granted until the identity of the applicant has been checked against all appropriate records or databases maintained by the Attorney General [or the Secretary of Homeland Security] and by the Secretary of State, including the Automated Visa Lookout System, to determine any grounds on which the alien may be inadmissible to or deportable from the United States, or ineligible to apply for or be granted asylum.

---

[2] *See* discussion of *Matter of X-P-T-,* 21 I. & N. Dec. 634, above.

70 Fed. Reg. 4743-4754 (2005) *reprinted at* AILA InfoNet Doc. No. 05012861 (posted Jan. 31, 2005).  Thus, the background check performed after the grant is essentially redundant; it is not part of the adjudicative process, but is ministerial.

However, having exercised his discretion to set policy and procedure relating to background checks, the Attorney General has a nondiscretionary obligation to conduct the ministerial background checks within a reasonable time.  A delay which delays the removal of the condition on asylum approximately three and half years beyond the statutory timeframe set in 8 USCS § 1158(d)(5)(A)(iii), and which is described by the CIS Ombudsman as "pervasive and serious" is not reasonable under the APA, 5 U.S.C. § 555(b).

**B.  This Court Has Jurisdiction Under the APA and the Mandamus Act; Jurisdiction Is Not Barred by the INA.**

In a recent Southern District of New York case, *Ibragimova v . Mueller,* 550 F. Supp. 2d 540 at *9-*11 (S.D.N.Y., May 1, 2008)  the court made the succinct holding that "where a plaintiff alleges that the defendant violated the APA, the court may exercise subject matter jurisdiction pursuant to *28 U.S.C. § 1331*" (federal question jurisdiction). *Ibragimova* involved an unreasonable delay in adjudicating an adjustment of status application due to the background check backlog.  As in this case, the APA provision at issue was 5 U.S.C. § 555(b), which states, "With due regard for the convenience and necessity of the parties or their representatives *and within a reasonable time*, each agency shall proceed to conclude a matter presented to it."  *See* 550 F. Supp. 2d 540, at *6.

In addition to federal question jurisdiction via the APA, the *Ibragimova* court also found jurisdiction under the Mandamus and Venue Act which

> empowers the federal courts to compel government officials to carry out "ministerial" duties. *Work v. United States ex rel. Rives, 267 U.S. 175, 177, 45 S. Ct. 252, 69 L. Ed. 561, 23 Ohio L. Rep. 251 (1925)*. The court's power depends on the nature of the duty sought to be compelled: relief "will issue only to compel the performance of a 'clear nondiscretionary duty.'" *Pittston Coal Group v. Sebben, 488 U.S. 105, 121, 109 S. Ct. 414, 102 L. Ed. 2d 408 (1988).*

*Id.* at *7.

Finally, *Ibragimova* held that judicial review was not barred by 8 U.S.C. § 1252(a)(2)(B) because the Government has a nondiscretionary duty to adjudicate adjustment applications.  550 F. Supp. 2d 540, at *15, *18.[3]   *Ibragimova* arrived at these

---

[3] *See also Bondarenko v. Chertoff*, 2007 U.S. Dist. LEXIS 67143 at *14-15 (W.D.N.Y. 2007):

> [T]he INA does not give the Attorney General authority to decide whether or not to adjudicate an application, nor does it specify that the pace of

holdings after a review of numerous recent mandamus/APA cases brought after DHS failed to perform nondiscretionary ministerial duties within a reasonable time period. 550 F. Supp. 2d 540, at *9-*12, *see also Aslam v. Mukasey*, 531 F. Supp. 2d 736, 740 n.4 (E.D.Va. 2008) (list of 34 cases nationwide).   In finding jurisdiction *Ibragimova* followed the majority of the cases.  *Id.* at *14.

Plaintiff argues that *Ibragimova*  and the numerous cases it cites which have found jurisdiction under circumstances similar to those presented here, are correctly decided.  This Court has jurisdiction under the APA and the Mandamus Act; jurisdiction is not barred by the INA.

## C.  The Four Year Delay in Removing the Condition on Mr. Ni's CFP Asylum Grant is Clearly Unreasonable.

Although background checks in CFP conditional grant asylum cases are ministerial and therefore required to be completed in a reasonable time under 5 U.S.C. § 555(b) , and despite the statutory timeline guidance set out in 8 USCS § 1158(d)(5)(A)(iii), the Government argues that the delay of almost four years in Mr. Ni's case is not unreasonable.  Government's Brief at 13 n.3.  Alluding to the pervasive and serious FBI name check backlog the Government implies that it is not unreasonable for Mr. Ni to line up along with "thousands of other aliens" to patiently await action by the USCIS and "other federal agencies," regardless of how long the process may take.  *Id.* at 6 n.2.  The Government's position that the Attorney General has

> unreviewable discretion to grant or deny applications under *§ 1255(a)* extends to discretion to adjudicate those requests at the pace of his choosing -- no matter how slow -- is inconsistent with its obligation under the APA to conclude the matter presented it within a reasonable time.

*Eid v. Chertoff*, 2008 U.S. Dist. LEXIS 25264 at *14-*15 (D. Conn. 2008).

An argument similar to the one the Government makes in this case was addressed in detail by the Federal District Court for the Eastern District of Virginia in *Aslam v. Mukasey*, 531 F. Supp. 2d 736, 744, 744 n.7:

> The government's . . . explanation for CIS's delay - limited FBI resources - is an issue that has no relevance to the present inquiry. The APA imposes a *legal* obligation on CIS to complete name checks within a reasonable period of time. If the FBI's name check process is obstructing compliance with that legal obligation, CIS must either remove the obstruction or accept the legal penalties. Bureaucratic inadequacy is not a justification, especially because the costs of noncompliance are imposed on the applicant.  . . .  For instance, CIS could reduce the demands on the FBI by

> adjudication is committed entirely to the Attorney General's discretionary judgment. Absent express provisions to that effect, *§ 1252(a)(2)(B)(ii)* does not bar claims of a failure to adjudicate or adjudicatory delay.

prioritizing name check requests, developing alternative methods of
collecting the same information, allocating funds to the FBI to hire
additional personnel, or lobbying the political branches to increase the
FBI's funding.

Similarly, the District of Connecticut recently said:

Given the high volume of applications and the scarcity of resources,
Defendants and other agency officials may find themselves short on the
resources necessary to fulfill their statutory duty within a reasonable time.
While this may be a legitimate policy crisis, the Court will not excuse
Defendants from their statutory duty and let the cost fall on immigrant
plaintiffs.

*Alkeylani v. D.H.S.*, 514 F. Supp. 2d 258, 266 (D. Conn. 2007)

**D.    Because the Completion of the Background Check and Removal of the
Condition on Mr. Ni's Asylum Grant is Are Ministerial, Nondiscretionary Duties,
Mr. Ni is Entitled to the Relief He Has Requested in His Complaint.**

Because Mr. Ni's asylum application has already been adjudicated, all
discretionary decisions regarding his case have been taken and only ministerial tasks
remain, Mr. Ni's request for relief is proper.  Pursuant to 5 U.S.C. § 555(b) this Court
should order the DHS to promptly complete the necessary background check, remove the
condition on Mr. Ni's asylum grant and issue a final grant letter.

In the alternative, if this Court determines that either the background check or the
removal of the condition on Mr. Ni's asylum grant is a nonministerial element of the
discretionary asylum adjudication process, Mr. Ni requests that the Court find a violation
of the timeframe established by 8 USCS § 1158(d)(5)(A)(iii) and unreasonable delay
under APA  5 U.S.C. § 555(b).  As the District of Connecticut has held,

The government simply does not possess unfettered discretion to relegate
aliens to a state of "limbo," leaving them to languish there indefinitely.
This result is explicitly foreclosed by the APA.

*Cekan v. Chertoff,* 536 F. Supp. 2d 211 at *11, *quoting Kim v. Ashcroft*, 340 F. Supp. 2d
384, 393 (S.D.N.Y. 2004).  If this Court finds adjudicative rather than ministerial delay,
Mr. Ni requests that the Court follow the procedure used in *Alkeylani v. D.H.S.*, 514 F.
Supp. 2d 258, and order DHS to complete its adjudication of Mr. Ni's asylum claim
within 30 days.  *See id. at* 266.

## II. CONCLUSION

This Court has federal question jurisdiction under the APA and additional jurisdiction under the Mandamus Act to consider this case and to grant relief.

The discretionary, adjudicative phase of Mr. Ni's asylum application was complete at the time of Mr. Ni's CFP conditional grant of asylum. The Government has not moved to reopen the case and has made no suggestion whatever that any grounds to reopen exist. The remaining tasks: the completion of the background check, removal of the condition and issuance of the final grant letter are purely ministerial.

DHS has unreasonably delayed in performing these ministerial tasks, in violation of the Administrative Procedures Act. Limited FBI or CIS or other administrative resources does not excuse DHS from performing its statutory duty. This Court should order DHS to complete its ministerial tasks within 30 days and issue the final grant letter.

If this Court determines that conducting background checks is an element of the discretionary process of adjudicating Mr. Ni's asylum application, then the DHS has violated its statutory obligation under the APA to adjudicate within a reasonable time and its statutory obligation under the INA to adjudicate an asylum application within 180 days. If this court finds a delay in adjudication rather than a delay in the performance of nondiscretionary ministerial tasks, it should order that the adjudication of Mr. Ni's asylum claim be completed within 30 days.

Respectfully Submitted,
Law Offices of Yee Ling Poon
11 East Broadway, 5th Floor
New York, NY 10038
(212) 385-4575
Attorneys for Petitioner

_____
Yee Ling Poon, Esq.

Deborah Niedermeyer, Esq.
*On the Brief*

Dated: July 28, 2008
New York, NY

7

# EXHIBIT 1



**U.S. Department of Justice**
Executive Office for Immigration Review
*Office of the Director*
*5107 Leesburg Pike, Suite 2600*
*Falls Church, Virginia 22041*

# NEWS RELEASE

**Contact:**  Office of Legislative and Public Affairs
(703)305-0289  Fax: (703)605-0365
**Internet:**  www.usdoj.gov/eoir

December 16, 2004

## EOIR Notifies Persons Eligible for Full Asylum Benefits for Fiscal Year 2004 Based on Coercive Population Control Policies

FALLS CHURCH, VA – The Executive Office for Immigration Review (EOIR) today announced that notices have been sent to those individuals in the United States with conditional grants of asylum based on resistance to a coercive population control program (CPC) who now are fully eligible for all asylum benefits.  The spouses and children of these individuals also are eligible for all asylum benefits if they were properly included in the application for asylum (Form I-589) as dependents and if they reside in the United States.  (To receive asylum benefits as dependents, children must be under 21 years of age or classified as children under the Child Status Protection Act.)

The law specifically limits the number of individuals who can be granted asylum on grounds related to CPC to 1,000 per fiscal year (FY).  Asylum is granted to such individuals on a conditional basis by Immigration Judges and by the Board of Immigration Appeals in EOIR, or by Asylum Officers in the U.S. Citizenship and Immigration Services (USCIS) of the Department of Homeland Security (formerly the Immigration and Naturalization Service).  Because the number of individuals who annually establish eligibility for asylum based on CPC has been greater than 1,000, these individuals are placed on a waiting list and remain in conditional grant status until one of the 1,000 final approval authorization numbers becomes available.  More than 9,000 asylum applicants currently are on the waiting list.  Consequently, for those who were granted conditional asylum during FY 2004, the waiting period for full asylum benefits is approximately 9 years.

Each fiscal year, EOIR and USCIS chronologically arrange all conditional asylum grants by the date of the conditional grant, convert no more than 1,000 to full asylum grants, and then notify the grantees by mail.  Final approval for full asylum benefits cannot be issued in an individual case until the required identity, background, and security checks have been completed for the principal applicant and for all included dependent family members in the United States.

The USCIS has issued approximately 800 of the 1,000 FY 2004 final approval authorization numbers.  Most individuals who were conditionally granted asylum by EOIR or USCIS on or before September 15, 2000, and whose identity, background, and security checks have been updated and cleared, have been notified of eligibility for full asylum benefits.

Because of additional security check requirements added in FY 2003, the process of issuing the 1,000 final asylum approvals has taken longer than in previous years, and final approvals are being issued in smaller groups than in the past.  USCIS is closely monitoring the results of the security checks and is issuing final approvals of asylum, as individuals receive their security clearances, up to the 1,000 annual cap.

(more)

## Status Inquiries

Persons who were granted conditional asylum on or before September 15, 2000, but who have not received a notice regarding final asylum approval, should check on the status of their final asylum approval, if they have not already done so, by sending a letter to the appropriate address specified below. The letter should include:

- Full name of the person who filed the asylum application and has been granted conditional asylum,

- His or her date of birth,

- His or her alien number,

- His or her current address (see also **Required Actions**, below), and

- A copy of the order or letter granting conditional asylum.

*If an **Immigration Judge** issued the conditional grant of asylum,* status inquiries must be sent to:

> Office of the Chief Immigration Judge
> Attn:  CPC Status Inquiry
> 5107 Leesburg Pike, Suite 2500
> Falls Church, VA  22041

*If the **Board of Immigration Appeals** issued the conditional grant of asylum*, status inquiries must be sent to:

> Board of Immigration Appeals
> Clerk's Office
> Attn: CPC Status Inquiry
> Post Office Box 8530
> Falls Church, VA  22041          Phone: 703-605-1007

*If a **USCIS Asylum Officer** issued the conditional grant of asylum,* status inquiries must be sent to the USCIS Asylum Office that has jurisdiction over the conditional grantee's residence.  The USCIS Web site at http://uscis.gov/graphics/fieldoffices/alphaa.htm provides the jurisdiction and addresses of the eight USCIS Asylum Offices.


## Required Actions for Individuals with Conditional Asylum

Persons who remain in conditional asylum status must comply with any requests to appear for fingerprinting and biometrics or other background clearance procedures.  They also must provide any changes of address promptly in the following manner:

*If an **Immigration Judge** issued the conditional grant of asylum*, individuals must submit to the Immigration Court that last had jurisdiction over their case a completed Form EOIR-33/IJ, "Change of Address Form," within **5 days** of any change of address.  Addresses for the Immigration Courts can be found on the EOIR Web site at http://www.usdoj.gov/eoir/sibpages/ICadr.htm.  They **also** must submit a completed Form AR-11, "Alien's Change of Address Card," within **10 days** of any change of address to the Department of Homeland Security at the address indicated in the form instructions.


(more)

*If the **Board of Immigration Appeals** issued the conditional grant of asylum*, individuals must submit a completed Form EOIR-33/BIA, "Change of Address Form," within **5 days** of any change of address to the address below:

> Board of Immigration Appeals
> Clerk's Office
> Post Office Box 8530
> Falls Church, VA 22041                    Phone: 703-605-1007

They **also** must submit a completed Form AR-11, "Alien's Change of Address Card," within **10 days** of any change of address to the Department of Homeland Security at the address indicated in the form instructions.

*If a **USCIS Asylum Officer** issued the conditional grant of asylum,* individuals must submit to the Department of Homeland Security at the address indicated in the form instructions a completed Form AR-11, "Alien's Change of Address Card," within **10 days** of any change of address. They **also** should send a copy of their completed Form AR-11 to the USCIS Asylum Office that has jurisdiction over their residence. The USCIS Web site at http://uscis.gov/graphics/fieldoffices/alphaa.htm provides the jurisdiction and addresses of the eight USCIS Asylum Offices.

Change of address forms are available as follows:

- Forms EOIR-33/IJ and EOIR-33/BIA are available on the EOIR Web site at http://www.usdoj.gov/eoir/formslist.htm, and

- Form AR-11 is available at local post offices, USCIS offices, and on the USCIS Web site at http://uscis.gov/graphics/formsfee/forms/ar-11.htm.

**Note:** Failure to notify the Government of a change of address, as specified above, may result in ineligibility for a final grant of asylum.

**For More Information**

Additional information about CPC and asylum is available on the USCIS Web site at http://uscis.gov/graphics/services/asylum/cpc.htm. News releases and a fact sheet regarding the annual issuance of full asylum benefits based on CPC are available on EOIR's Web site at http://www.usdoj.gov/eoir/press/press.htm.

Individuals who have received final asylum approval notices may obtain information about their benefits and responsibilities on the USCIS Web site at http://uscis.gov/graphics/services/ asylum/ types.htm#grant.

– EOIR –

# EXHIBIT 2

# AFFIRMATIVE ASYLUM PROCEDURES MANUAL
# OFFICE OF INTERNATIONAL AFFAIRS
# ASYLUM DIVISION

## FEBRUARY 2003



If the new address falls under the jurisdiction of another asylum office, the asylum office where the interview was conducted retains jurisdiction over the case. The applicant is still obligated to appear at the asylum office if s/he was served a *Pick-Up Notice* at the time of the interview, although the asylum office Director maintains the discretion to cancel the pick-up appointment and mail out the decision. Any documents that were generated with the applicant's old address that have not been served must be regenerated to reflect the new address.

### c.    Received After Service of a Decision

Asylum office personnel update RAPS and route the evidence of the change of address to the file.

## B.    CATEGORIES OF CASES

## 1.    Aliens Not Entitled to Proceedings under Section 240 of the INA

Certain categories of aliens enumerated in 8 CFR 208.2(c)(1) are entitled to only limited immigration judge hearings for consideration of asylum and withholding or deferral of removal applications only. The six so-called "asylum-only" categories are applicants who applied for asylum after April 1, 1997 and are:

- Crewmembers;
- Stowaways who pass the credible fear standard;
- Applicants for admission under VWPP (in the inspections context);
- VWPP overstays;
- Aliens ordered removed under section 235(c) (security and related grounds); and,
- Nonimmigrants admitted pursuant to 101(a)(15)(S) (witnesses and informants).

"VWPP" and "VWP" may be used interchangeably. VWPP stood for Visa Waiver Pilot Program. The program is now permanent. Either abbreviation is acceptable.

The asylum program does not take jurisdiction to consider affirmative asylum applications from members of these six categories. The regulations currently direct such individuals not under the jurisdiction of EOIR to file their asylum applications directly with the District Director, who will issue an I-863 and forward the asylum application to the Immigration Court. 8 CFR 208.4(b)(5). When the asylum office encounters an application from a member of one of the six "asylum-only" categories, the asylum office issues the I-863 and forwards the I-863 and asylum application to the appropriate Immigration Court. When encountering such a case, asylum office personnel take the following actions:

- If the interview has not yet taken place, cancel or suspend the interview.
- Copy any documents that evidence the applicant's status and place them in the file.
- Print any NIIS screens that show the applicant's entry into the U.S. and place them in the file.

If the applicant was ordered removed under INA § 235(c) or admitted pursuant to INA § 101(a)(15)(S), contact HQASM Operations for further guidance before proceeding. For other "asylum-only" category cases, depending on local asylum office policy, either issue a *Pick-up Notice* to the applicant, or serve the necessary documents on the applicant while s/he is still in the asylum office. In either case, asylum office personnel:

- Prepare a *Referral Notice*, and at "Other Reasons for Referral," write: "You are an alien **[insert applicable language from 8 CFR 208(c)(1)(i)-(vi), e.g.**

"crewmember who has been refused permission to land under section 252"] and filed an asylum application on or after April 1, 1997. INS does not have jurisdiction over your case and only an Immigration Judge may hear your claim. Your Form I-589 *Application for Asylum and for Withholding of Removal* will be forwarded to the Immigration Judge."

- Prepare a Form I-863, *Notice of Referral to Immigration Judge*, placing a ✓ in the box next to item 3 and in the appropriate box indicating the category of case.
- Prepare a Form I-213, if required.
- Copy the I-589 for the Immigration Judge.
- Administratively close the asylum application on the Close Case (CLOS) screen, indicating the reason for closure as "IJ Jurisdiction" (C4), placing a "Y" in the "Send to IJ" field.

The following guidance, specific to certain of the above categories, is provided to clarify when the above procedures apply.

### a.  Crewmembers

#### i.  *Crewmembers who applied for asylum on or after 4/1/97*

An asylum office does not take jurisdiction to adjudicate an asylum claim filed on or after April 1, 1997 by a crewmember, as defined in the INA. As used in the INA, the term crewmember only pertains to an alien who last arrived in the U.S. on a vessel in the capacity of a working crewman and:

*8 CFR 208.2(c)(1)(i)*

- is applying for a landing permit;
- was inspected and refused admission; or
- was inspected and admitted as a D-1 or D-2 nonimmigrant.

An alien who arrived in any other manner is not considered a crewmember for INA purposes, even though the alien may possess a D nonimmigrant visa or be regularly employed as a crewmember. For example, a person regularly employed as a crewman but who was last admitted as a B-2 tourist or a C-1 alien in transit to a vessel, or who arrived without inspection, would not be classified as a crewmember for INA purposes. In such a case, the asylum office may take jurisdiction to adjudicate the application (provided the applicant in not under the jurisdiction of EOIR).

A crewmember who last arrived in a working capacity on a vessel, was inspected and paroled (e.g. for medical treatment), and is still maintaining parole status is processed for asylum purposes as any other parolee. *See* Section III(Q). However, if parole status has expired or been terminated, the alien reverts to an applicant for a landing permit and the guidance in this section applies.

#### ii.  *Crewmembers who applied for asylum prior to 4/1/97*

The asylum office takes jurisdiction over asylum claims filed by crewmembers prior to April 1, 1997. If the crewmember is found ineligible for asylum and is not maintaining lawful immigrant, nonimmigrant or Temporary Protected Status, asylum office personnel process the crewmember's application as a regular referral, issuing an I-862 (NTA).

*8 CFR 208.2(b)*

### b.  Stowaways

An arriving alien who has been identified *by inspections* as a stowaway is not entitled to make an affirmative asylum application or to removal proceedings pursuant to INA § 240.

*8 CFR 208.2(c)(1)(ii)*

*See* INA §§ 235(a)(2), 235(b)(1).  Stowaways are interviewed by asylum officers for credible fear.  8 CFR 208.30.  For procedures relating to stowaways, refer to the *Credible Fear Procedures Manual*.  If inspections identified the applicant as a stowaway, but the applicant absconded before the credible fear process could be completed and the applicant later files an I-589 with the Service, the asylum office interviews the applicant for credible fear and issues an I-863 as follows: 1) for asylum-only proceedings if credible fear is found; **or** 2) for IJ review if a negative credible fear decision is made and the alien requests review.  If no credible fear is found and the applicant does not request IJ review, asylum office personnel refer the stowaway to a Detention Officer for removal from the U.S.  For more detailed guidance on processing true stowaways, see *Procedures Manual - Credible Fear Process*.

An applicant who testifies that s/he traveled to the United States by concealing him or herself on a ship, but jumped ship or otherwise absconded without being identified by INS as a stowaway is *not* processed as a stowaway.  The asylum office accepts affirmative asylum applications from these individuals and treats them as having entered without inspection (EWI).

### c.    Visa Waiver Pilot/Permanent Program (VWPP) Applicants

8 CFR 208.2(c)(1)(iii), (iv)

The asylum office does not take jurisdiction to adjudicate the asylum application of a principal applicant who was admitted under the VWPP **unless**:

- The applicant was inspected and properly admitted under the Visa Waiver Pilot or Permanent Program (VWPP) **and**
- The I-589 was **filed before** the expiration of the 90-day period of authorized stay under the VWPP.

  **-OR-**

- The application was **filed before April 1, 1997**, regardless of when the 90-day period of admission expired.

The evidence required to support a finding of proper admission under the VWPP is discussed in the next section.  For the purposes of these procedures, proper admission **does not include** admission by fraud.  For example, if the asylum applicant filed his or her I-589 after April 1, 1997 and before the expiration of his/her 90-day period of admission under the VWPP, but was admitted through the use of fraudulent documents, the asylum office does not have jurisdiction to adjudicate the I-589.  If the asylum office does not have jurisdiction over the application, asylum office personnel follow procedures in this section above under III(B)(1) *Aliens Not Entitled to Proceedings under Section 240 of the INA.*

When the asylum office takes jurisdiction to adjudicate an asylum application pursuant to the above procedure, the asylum office retains jurisdiction to complete adjudication of the case, even if the 90-day period of admission expires before the asylum office completes processing of the case.  The application is processed identically to other asylum applications for interview and decision, except that for referrals, an I-863 *Notice of Referral to Immigration Judge* is prepared instead of an NTA.  In RAPS, the deportation code is A5.  The status at entry to be input in RAPS on the I589 screen is "WB – Visitor Without Visa 90 Da [*sic*]."

### i.    *Evidence of Admission Under the VWPP*

An applicant must produce evidence of his/her admission (whether *bona fide* or *mala fide*) to the U.S. under the VWPP for the asylum office to process the case using the procedures in this section relating to applicants admitted under the VWPP. When an applicant has been admitted as a VWPP visitor, these procedures apply regardless of whether the applicant gained admission properly and lawfully or by falsely claiming to be a national of a VWPP-designated country (including presentation of a counterfeit or impostor passport from such country).

If the applicant claims admission under the VWPP (either with genuine or fraudulent or fraudulently obtained documents), s/he must present a passport or signed I-94W card evidencing the admission, or the asylum officer must confirm the applicant's admission under the VWPP in NIIS or other INS system containing entry information. An applicant's credible testimony or sworn statement will ordinarily not suffice for the asylum office to treat the applicant as having been admitted as a VWPP visitor, but asylum office Directors maintain the discretion to permit the filing of I-863s based on sworn statements alone if it is determined, in coordination with District Counsel, that proceedings will not be terminated. Forms I-94W for VWPP visitors bear the notation "WB" for business visitors and "WT" for visitors for pleasure.

If an applicant's claim of admission under the VWPP cannot be substantiated as described above, the asylum office does not consider the applicant as having been admitted under VWPP, and the procedures in this section do not apply. The manner of entry for the applicant is recorded as "unknown" on the I589 screen in RAPS, and the AO proceeds with the interview and adjudication of the claim. If such an applicant is to be referred to the Immigration Judge, asylum office personnel issue an NTA (not an I-863) containing an NVD1 or NVD2 charge, depending on local office policy.

If the applicant is able to establish his/her admission into the U.S. under the VWPP, even through the use of a fraudulent passport, asylum office personnel determine jurisdiction and process the case according to the guidance contained in this section, III(B)(1), *Aliens Not Entitled to Proceedings Under Section 240 of the INA.*

### ii.    Dependents Admitted under the VWPP

The asylum office takes jurisdiction over a dependent who entered the U.S. as a VWPP visitor when taking jurisdiction over the P.A., regardless of when the application was filed or whether the 90-day period of authorized stay has expired. The dependent's status at entry in RAPS is "WB."

A dependent who entered as a VWPP visitor who is being referred to the Immigration Judge should receive an I-863 instead of an NTA, even if the P.A. is receiving an NTA. When preparing the referral letter for the principal, asylum office personnel insert the following language in the "Other" section of the referral letter:

> "Your dependent, (name, A#), was admitted to the U.S. as a Visa Waiver Program (VWP) visitor under section 217 of the Immigration and Nationality Act, and has remained longer than authorized. A VWP visitor is entitled to only limited immigration judge proceedings to review his/her claim for asylum. Therefore, s/he is being issued a Form I-863 for such a proceeding in accordance with 8 CFR 208.2(c)(1) and 217.4(b)."

The fact that an applicant cannot establish entry as a VWPP applicant does not necessarily mean that s/he failed in the burden of proof as to entry for purposes of the one-year filing deadline,

because manner of entry is not necessarily determinative of date of entry. AOs should consult the one-year filing deadline lesson plan for standard of proof issues.

---

1 HQASM is requesting updates to RAPS and the RAPS Forms Generation Module that will permit generation of Form I-863 in RAPS.

The deportation code in RAPS is "A5." Because RAPS does not generate Forms I-863, asylum office personnel will need to enter "OVER" as the charge on the OSCG screen in order to create a record that a charging document was prepared for the dependent and to complete the case in RAPS.[1] Asylum office personnel may update the OSSE screen the same way as for other referrals.

### iii.    Applicant Paroled into U.S. During VWPP Contingency Plan

Applicants from VWPP-designated countries who were paroled into the U.S. during the interim period between the expiration of the Visa Waiver Pilot Program and the enactment of the Visa Waiver Permanent Program Act (May 1, 2000 – October 30, 2000) are processed as parolees. See Section III(Q), *Parolees*, in this Manual. *See* Langlois, Joseph E. Asylum Division. *Visa Waiver Pilot Program (VWPP) Contingency Plan Guidance,* (Washington, DC: 10 May 2000), 1 p. A visitor paroled under the contingency plan should have a passport and Form I-94W with the word "admitted" crossed out and the word "paroled" written in its place. The paroled code for these cases was "CP."

*See 8 CFR 217.2(a) for the list of designated countries.*

### iv.    Guam Visa Waiver Program

The asylum office has jurisdiction to adjudicate asylum applications filed by applicants admitted to Guam pursuant to the Guam Visa Waiver Program (GVWP). The application is processed identically to other asylum applications for interview and decision, except that for referrals, an I-863 *Notice of Referral to Immigration Judge* is prepared instead of an NTA. In RAPS, the deportation code is A5. Because RAPS does not generate Forms I-863, asylum office personnel will need to enter "OVER" as the charge on the OSCG screen in order to create a record that a charging document was prepared for the dependent and to complete the case in RAPS. Asylum office personnel may update the OSSE screen as they would for other referrals.

*References: INA § 212(l) 8 CFR 212.1(e)*

## 2.    Applicants for Admission at Land Border Ports of Entry

An applicant for admission at a land border port of entry is ineligible to make an affirmative application for asylum. *See* INA § 208(a)(1). Applicants for admission at land border ports of entry will be placed in expedited removal proceedings and referred for a credible interview pursuant to 8 CFR 208.30. For guidance relating to credible fear determinations in the context of expedited removal, refer to the *Credible Fear Procedures Manual.*

*See Cronin, Michael D. INS Office of Programs. Aliens Seeking Asylum at Land Border Ports-of-Entry, Memorandum to Michael A. Pearson, INS Office of Field Operations. (Washington, DC: 29 January 2002), 3 p.*

The RAPS special group code "BOR," which was formerly used to designate the case of an applicant who was in Mexico or Canada awaiting an affirmative asylum interview has been disabled from future use in a case with a filing date on or after January 29, 2002.

## 3.    Children Filing as Principal Asylum Applicants

The asylum office Director must bring to the attention of HQASM any case of a child under the age of 18 who has applied for asylum as a principal and whose parent or legal guardian has not given express consent for the child to apply for asylum in the United States. HQASM and OGC will provide specific guidance on processing the case, if necessary, based on the particular circumstances of each child.

Special guidelines were developed by the Office of International Affairs for adjudicating asylum claims filed by individuals under the age of 18 who are applying for asylum independently, rather than as dependents. See Weiss, Jeffrey. Office of International Affairs. *Guidelines for Children's Asylum Claims*, Memorandum to Asylum Officers,

Immigration Officers and Headquarters Coordinators (Washington, DC: 10 December 1998), 30 p.

AOs must familiarize themselves with these guidelines in relation to guidance in Section II(J) on conducting an asylum interview and the applicable AOBTC Training Materials, including *Interviewing Parts I – IV*.

## 4.    Coercive Family Planning (CFP)

In September 1996, the Illegal Immigration Reform and Responsibility Act (IIRIRA) amended the refugee definition to include persons who have been persecuted in the past or have a well-founded fear of future persecution on the basis of a forced abortion, involuntary sterilization, failure or refusal to undergo such a procedure, or for other resistance to CFP practices.

IIRIRA placed a cap of 1,000 on the number of individuals who may be admitted as refugees or approved for asylum status on a claim relating to CFP practices during any fiscal year.

HQASM changed RAPS so that it could track the number of asylum claims based solely on CFP practices.  First, a "CFP" designation was created for the "BASIS OF CLAIM" field on the both the PDEC and FDEC screens.  Second, procedures were instituted to allow for a conditional grant of asylum to an applicant whose asylum claim is based solely on resistance to coercive family planning practices.

*The acronyms "CFP" and "CPC" (coercive population control) are both used within INS and are interchangeable.*

*Only principal applicants are counted against the 1,000 cap*

*See Matter of X-P-T, Int. Dec. 3299 (BIA 1996).*

### a.    Conditional Grant – Definitions And Entitlements

When an applicant is granted asylum "conditionally," it means that the applicant has met all of the conditions to be granted asylum status; however, s/he cannot receive a final asylum approval because a CFP authorization number is unavailable.  The following conditions must be present in order for an applicant to receive a conditional grant of asylum:

- The applicant is eligible for a grant of asylum based **solely** on CFP practices.
- The asylum office has received results of identity and security checks for the P.A. and all dependent family members who require them, and these results allow for an asylum approval.

If the claim is based upon CFP practices and another ground, such as religion, the asylum office should **not** prepare the case for a conditional grant, as the applicant is not being granted **solely** upon resistance to CFP practices.  For this reason, the updating of RAPS under the "BASIS OF CLAIM" field is extremely important.  If the applicant is eligible for asylum based upon two (2) grounds (CFP + another ground), the AO must enter both grounds into RAPS.  Asylum office personnel then prepare an asylum approval instead of a conditional grant after identity and security checks are complete, and those results allow for an asylum approval.

An individual who receives a conditional grant may remain in the United States and apply for employment authorization as a recommended approval under 8 CFR 274a.12(c)(8)(ii).  Qualified derivative applicants included on the asylum application also receive conditional asylum status and may apply for employment authorization.  A principal who has received a conditional grant is not eligible to file a Form I-730, nor is the applicant entitled to apply for adjustment of status under section 209(b) of the Act.

### b.    CFP Final Approval Authorization Number

If the asylum claim is based solely upon CFP practices, the asylum office cannot prepare an *Asylum Approval* until it receives a CFP authorization number from HQASM. Only 1,000 CFP authorization numbers are released each year, which corresponds to the 1,000 per year statutory cap on asylum grants and refugee admissions based on resistance to CFP practices.

HQASM currently compiles data files of persons who have received conditional asylum grants based on coercive population control, as reported by the eight asylum offices, the Immigration Courts, and the BIA. The background identity and security checks of conditional grantees near the top of the list are periodically updated by HQASM with assistance from the asylum offices and, for cases before EOIR, District Counsel. On an annual basis, individuals with completed and updated security checks who remain eligible for asylum are issued the 1,000 final approval authorization numbers for that fiscal year chronologically based on the date the INS or EOIR issued the conditional grant. Issuance of the authorization number allows the asylum office to issue a final approval of asylum to the applicant and any qualified dependents included on the application. The numbers are usually issued in two groups to ensure that any cases missed during the first round that should have been issued a number or whose security checks had not yet cleared receive a number in the second round.

EOIR typically issues a press release each year to notify the public that the final approval authorization numbers are being issued. The press release includes a cut-off date representing the date applicants with conditional grants effective on or before this date with cleared security checks should receive final approval. The press release also instructs applicants with questions about receiving a final approval to contact the asylum office that issued the conditional grant.

### c.    Processing a Conditional Grant

#### i.    *Security checks current and complete at the time decision is initially prepared*

If all the identity and security checks are current and complete for the P.A. and all dependents who require identity and security checks at the time the decision is initially prepared, asylum office personnel take the actions listed below. "Identity and security checks" include FBI name checks, FBI fingerprint checks, IBIS, and other checks on the *Asylum and NACARA § 203 Background Identity and Security Checklist* (Appendix A 62).

HQASM has requested a change to RAPS to allow AOs to proceed to a PDEC of GC without entering a PDEC of GR (recommended approval) first when security checks are complete. This change may not be in effect at the time of publication

- Update the Preliminary Decision (PDEC) screen in RAPS to indicate a conditional grant ("GC"). A dependent, if any, is updated as a recommended approval ("GR").
- Prepare a *Conditional Grant* letter (Appendix A 11). The effective date of the conditional grant is the same date RAPS is updated as a conditional grant.
- Serve the *Conditional Grant* letter either by regular or certified mail, as dictated by local asylum office policy.

#### ii.    *Security checks out of date or incomplete at the time decision is initially prepared*

When security checks are incomplete or outdated at the time of the initial decision, the asylum office issues the applicant a recommended approval. RAPS will convert a recommended approval to a conditional grant as follows:

- RAPS will automatically convert a case ONLY when ALL family members have a NONIDENT response from the FBI.

- RAPS assigns the conditional grant date as the earliest date on which all family members had NONIDENT responses, but no earlier than the date on which the AO entered the recommended approval.

While RAPS automatically updates cases as described above, asylum office personnel remain responsible for timely notifying the applicant of his or her status by mailing a conditional grant letter and confirming the applicant's continued eligibility for a conditional grant by checking IBIS and FBI name check results before mailing out the conditional grant letter. The weekly RAPS report, CPC PDEC GR CONVERTED TO GC, is generated listing each case that has been converted to a conditional grant.

A second part of the report, CPC PDEC GR NOT CONVERTIBLE TO GC, is used to identify cases that could not be converted to conditional grant due to a lack of current fingerprint response or a REJECT or IDENT response, and which may require additional follow-up to ensure the case is on track to an appropriate completion. If a principal applicant or dependent receives an FBI response of MAX. REJECT or IDENT, the CPC coordinator must ensure that all appropriate follow-up is completed to establish the applicant's eligibility for a conditional grant of asylum and that the conditional grant is entered into RAPS manually. The report lists reasons a case could not be converted as "FINGERPRINTS NEEDED" or "OVERRIDE REQUIRED." FINGERPRINTS NEEDED may signify, among other things, that a case has no fingerprint appointment request pending, or a case in which fingerprints have been taken but a response has not yet been updated in RAPS. OVERRIDE REQUIRED may refer to an IDENT response or double REJECT responses. The CPC coordinator reviews RAPS and the A-file and ensures that the required follow-up, if any, is completed.

Asylum office personnel and CPC coordinators are not to remove, correct, or otherwise change a conditional grant date in RAPS without consulting with HQASM. Asylum office personnel who perceive problems with automatic RAPS CPC programs should refrain from making any corrective changes and contact HQASM immediately.

### d.    Preparing an Asylum Approval after Receipt of a CFP Authorization Number

Each asylum office Director has appointed a CFP Coordinator who is responsible for ensuring that a *Conditional Grant* becomes an *Asylum Approval* according to the following instructions, or as indicated by HQASM:

- HQASM updates RAPS with the CFP final approval authorization number, or issues to each CFP Coordinator a list of CFP numbers for cases for manual updating in RAPS using the Number (NUMB) command.
- After verifying that the identity and security checks are complete and the results allow for an approval, the CFP Coordinator ensures the cases are promptly prepared as *Asylum Approvals* in accordance with local policy.
  - ➢ The individual preparing an *Asylum Approval* should place a printout of the Case Status (CSTA) screen on the right-hand side of the file, after entering the Final Decision (FDEC) of G1. This printout will show which CFP number was given to the applicant.

*"Identity and security checks" include FBI name checks, FBI fingerprint checks, IBIS, and other checks on the Asylum and NACARA § 203 Background Identity and Security Checklist (Appendix A 62).*

## 5.      Credible Fear-Screened Affirmative Asylum Applicants

An asylum office may encounter an affirmative asylum application from an individual who was screened in through the credible fear program, but whose charging document was not filed or was terminated by the IJ due to a technical fault.  RAPS will display a "Y" in the "APSS" field on the CSTA screen if there is a record of an individual in the APSS (*Asylum Pre-Screening System*), the system used for adjudicating credible fear cases.  If the Y appears, asylum office personnel check the APSS system to determine the outcome and status of the credible fear adjudication, and whether a charging document was issued but not filed with EOIR.  Because such individuals are subject to the expedited removal/credible fear screening process, which has begun but was not completed due to a technical error, the asylum office will not take jurisdiction to hear their affirmative asylum claims.  Instead, if the asylum office encounters such an individual, the asylum office will correct the technical error by preparing and filing the appropriate charging document. Asylum office personnel take the following steps:

- If the A-file is not at the asylum office, order and wait for the A-file.
- Cancel or suspend the asylum interview, as appropriate.
- Notify the applicant that because he or she is subject to provisions of INA § 235, the asylum office does not hear the affirmative asylum application, and that the application will be forwarded to the immigration court with jurisdiction over the applicant's residence.  Explain this to the applicant in person if s/he is in the office and in all cases, issue to the applicant a *Notice of Institution of Removal Proceedings following Positive Credible Fear Screening* (Appendix A 65)
- Prepare and serve the charging document, copying the I-589 for the IJ.
- Close the case in RAPS using close code C4, "IJ Jurisdiction."

## 6.      Deferred Enforced Departure (DED)

Deferred Enforced Departure, referred to as DED, grants certain, qualified citizens and nationals of designated countries a temporary, discretionary, administrative protection from removal from the United States and eligibility for employment authorization for the period of time in which DED is authorized.  The President determines which countries will be designated based upon issues that may include, but are not limited to, ongoing civil strife, environmental disaster or other extraordinary or temporary conditions.  The decision to grant DED is issued as an Executive Order or Presidential Memorandum.

**Note:**
Please see below at Section III(B)(8) for procedures governing GTMO/DED Haitians.

An alien does not need to apply for and be granted DED in order to benefit from its provisions.  Although DED status is automatic for qualified citizens and nationals of designated countries, some exceptions exist to eligibility under this program, including persons who have committed certain crimes, persons who are persecutors, and persons who have previously been deported, excluded or removed.

Because the decision to extend DED protection is made by the President, it is not a statutory provision under the Immigration and Nationality Act and as such, it is not considered an immigration "status."  DED is not considered to be a valid immigrant, nonimmigrant, or Temporary Protected Status under 8 CFR 208.14(c)(2).  Therefore, individuals who are covered by DED and are not eligible for asylum must be referred to the immigration judge pursuant to 8 CFR 208.14(c)(1) unless they otherwise have valid status or parole as described in 8 CFR 208.14(c)(2) or (3).  DED does not prevent the INS from obtaining a removal order.  Rather, it prevents the INS from executing that order during the pendency of DED.  Therefore, asylum offices should proceed with referrals of such cases when asylum is not granted

*See* Langlois, Joseph E. Director, Asylum Division. *Clarification of Procedures for Processing Applicants Covered by Deferred Enforced Departure (DED) who are Ineligible for Asylum,* Memorandum to Asylum Office Directors, et al. (Washington, DC: 1

such cases when asylum is not granted.

When referring a person who appears to be covered by DED, include a memorandum to the file addressed to District Counsel and Detention and Removal indicating, "The individual who is the subject of this memorandum may be covered by Deferred Enforced Departure (DED)."

## 7.  Expeditious Processing Required

An asylum office Director may determine that it is in the best interest of INS to process an asylum application more expeditiously than usual because the case contains sensitive issues or there is special interest in the case.  Examples include, but are not limited to applicants who are being placed in witness protection programs; applicants who are providing information of national security concerns to other agencies within the Federal Government; and cases in which there is a family member in jeopardy (e.g., spouse or child of an asylum applicant is in danger of harm in the country of claimed persecution).

Once the Director determines that the asylum office will expedite the processing of an asylum application, the following process occurs:

- The Director or Security Officer communicates the essential facts of the case to the HQASM Supervisor, Quality Assurance/Training at (202) 305-2759.  HQASM/QA alerts the INS Public Information Officer, if appropriate, and the DRL/CRA.
- Upon receipt of the application, asylum office personnel send the I-589 application and supporting documents to HQASM/QA and the appropriate desk officer in DRL/CRA.  The DRL/CRA may decide to respond telephonically directly to the asylum office Director, with written confirmation to follow.
- An AO interviews the applicant as soon as practicable and prepares an *Assessment*. Following the interview the asylum office sends to HQASM/QA the I-589, supporting documentation, *Assessment*, interview notes, and any recommendation from DRL/CRA.  If the materials are 15 pages or less, asylum office personnel may fax them to HQASM/QA at (202) 305-2918.  If the materials are more than 15 pages, asylum office personnel sends them to HQASM/QA via Federal Express at 111 Massachusetts Avenue, 2nd floor, ULLICO Bldg., Washington, D.C.  20001.
- HQASM/QA responds within three days of receipt.  Until then, the asylum office places the case on HOLD - HQ in RAPS.

## 8.  GTMO/DED Haitians

Certain Haitian nationals who filed for asylum before December 31, 1995, or were paroled into the U.S. before December 31, 1995, were eligible for deferred enforced departure (DED).  These same individuals were also entitled to apply for Lawful Permanent Resident (LPR) status through the Haitian Refugee Immigration Fairness Act (HRIFA). The special group codes in RAPS for these cases are "HDD," "HGN," "HGT," "HGX" and "HGY."

Until further notice by HQASM, an asylum office does not interview an asylum applicant who was eligible for Haitian DED, unless the applicant requests to proceed with the affirmative asylum adjudication.  See Langlois, Joseph E. INS Asylum Division. *Suspension of Adjudication in the Cases of DED Eligible Haitian Applicants*, Memorandum to Asylum Office Directors (Washington, DC: 14 January 1998), 2 p.

# EXHIBIT 3

Citizenship and
Immigration Services
**Ombudsman**

# Annual Report 2008

*June 30, 2008*



# Table of Contents

Message from the Ombudsman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Executive Summary and Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

List of Figures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

I. Introduction and Mission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    A. State of USCIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    B. Ombudsman's Accomplishments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. Pervasive and Serious Problems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    A. FBI Name Check Delays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    B. Summer 2007 Surge: Frontlogs & Backlogs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    C. Managing the Green Card Lines and the Summer Surge . . . . . . . . . . . . . . . . . . . . . . 18
    D. Challenges with USCIS Fee Funding Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    E. Better Case Management Through Paperless Applications . . . . . . . . . . . . . . . . . . . . . 24
    F. Information Technology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    G. File Transfers and Tracking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    H. The Need for Better Statistics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    I. Customer Service and Public Inquiries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    J. Streamlining the Fingerprint Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    K. Intra-agency and Stakeholder Communication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
    L. Finding Efficiencies: Reducing Requests for Evidence (RFEs) . . . . . . . . . . . . . . . . . . 47
    M. USCIS Workforce . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
    N. Complexity and Standardization of the Immigration Process . . . . . . . . . . . . . . . . . . . 53

III. Other Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
    A. E-Verify . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
    B. Military Naturalizations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
    C. Up-front Processing and the Dallas Office Rapid Adjustment Program (DORA) . . . . 58
    D. N-648 Medical Waivers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
    E. K-3 Visa Family Reunification Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
    F. Card Production . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
    G. Naturalization Ceremonies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

IV. Past Recommendations and USCIS Responses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
    A. Previous Years . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
    B. 2008 Reporting Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

# I. Introduction and Mission

Section 452 of the Homeland Security Act of 2002[1] established the position of Citizenship and Immigration Services Ombudsman (Ombudsman) to be appointed by the Secretary of the Department of Homeland Security (DHS) and report directly to the Deputy Secretary. The current Ombudsman is Michael Timothy Dougherty,[2] appointed by Secretary Michael Chertoff on March 3, 2008.

This annual report is submitted pursuant to 6 U.S.C. § 272(c)(1) and covers the activities of the Ombudsman[3] from June 1, 2007, through April 30, 2008.[4]

The statutory mission of the Ombudsman is to:[5]

- Assist individuals and employers in resolving problems with U.S. Citizenship and Immigration Services (USCIS);

- Identify areas in which individuals and employers have problems dealing with USCIS; and,

- Propose changes to mitigate identified problems.

The Ombudsman believes the best way to assist individuals and employers is to encourage efficiency and better customer service at USCIS by recommending solutions to systemic problems in the delivery of immigration benefits,[6] and by identifying best practices. Working alongside USCIS, the Ombudsman also addresses individual cases. The Ombudsman provides unique perspectives because of its independent status[7] and its ability to obtain input directly from customers, stakeholders, and USCIS officials in the field.

The Ombudsman meets widely and frequently with non-governmental stakeholders, such as community-based organizations, legal and employer organizations, as well as USCIS leadership and employees who have insight into the agency's operations. The Ombudsman also evaluates and validates concerns through research alongside USCIS and affected agencies.

Research to identify problems is critical to making informed recommendations. In this regard, the Ombudsman is concerned with USCIS' limitations on the timely access to data and information about agency operations. Communication between the Ombudsman's office and USCIS has improved greatly. The coming year promises a stronger working relationship between the Ombudsman and USCIS, but its effectiveness depends upon the candid and timely sharing of information.

## A. State of USCIS

During the formation of DHS in 2003, USCIS was created from the immigration benefits section of the former Immigration

---

1   Section 452 of the Homeland Security Act (6 U.S.C. § 272). *See* Appendix 2 for excerpts of relevant sections of the Homeland Security Act.

2   *See* Appendix 1 for Mr. Dougherty's biography.

3   In this report, the term "Ombudsman" refers interchangeably to Ombudsman Dougherty, his staff, and the Ombudsman's office.

4   This report does include relevant information from May and June 2008, where applicable.

5   Section 452 of the Homeland Security Act (6 U.S.C. § 272). *See* Appendix 2 for excerpts of relevant sections of the Homeland Security Act.

6   "Immigration benefits" is the term used to describe the service side of the immigration benefits system (contrasted with enforcement). Primary immigration benefits include lawful nonimmigrant status, permanent residence (also known as adjustment of status, evidenced by a "green card"), naturalization, asylum, etc. Secondary immigration benefits or interim benefits include work permits, *i.e.*, Employment Authorization Documents (EADs), and travel documents (*e.g.*, advance parole), obtained while awaiting a primary benefit.

7   Section 452 of the Homeland Security Act (6 U.S.C. § 272) mandates that the Ombudsman report directly to the Deputy Secretary of DHS (as does the USCIS Director under section 451) and submit an annual report to the House and Senate Judiciary Committees without comment or amendment from DHS officers or employees or from the Office of Management & Budget (OMB).

and Naturalization Service (INS).[8] The agency is composed of 17,000 federal and contract employees who process approximately six million immigration applications each year (or about 30,000 applications each day).[9] Its employees work at four large service centers (St. Albans, Vermont; Mesquite, Texas; Laguna Nigel, California; Lincoln, Nebraska), or at 250 offices located worldwide. Each day, USCIS processes 135,000 national security background checks, captures 11,000 fingerprints, issues 7,000 green cards, and answers 41,000 phone inquiries. Communication and coordination of files and checks among all these offices, as discussed below, can be challenging.

Since its formation in 2003, USCIS has tackled surges in immigration applications and backlogs numbering in the millions. During the reporting period, USCIS continued to address the challenges of delivering immigration benefits to customers and, specifically: delays in FBI name checks; the summer 2007 application surge; the need for a comprehensive case management system; a high "request for evidence" rate where filings are incomplete or require additional evidence; and intra-agency and public communications concerns.

The most significant issue for USCIS in the past year was the summer surge in immigration filings. From June through August 2007, USCIS received approximately 67 percent more applications and petitions than it received for the same period in 2006.[10] In FY 2007, USCIS received 1.4 million naturalization applications, nearly double the number of applications from the previous fiscal year.[11] In June and July of 2007, USCIS experienced an increase of nearly 350 percent in naturalization applications compared to the same period in 2006.[12] Prior to the surge, USCIS projected that it would take 5 to 6 months to process an application for naturalization; in April 2008, it projected 13 to 15

months to do so.[13] The deluge in filings caused frontlogs (filings received physically at USCIS offices but for which the agency delayed in issuing receipts) and then backlogs (cases which remain pending past processing time goals), which may take USCIS months or years to complete.

The surge of applications in summer 2007 appears to have been caused by a combination of factors. First, some individuals sought to file applications before fees were set to increase on July 30, 2007.[14] Second, the publication of "current" priority date cutoffs for almost all employment-based categories in the July Department of State Visa Bulletin prompted approximately 300,000 foreign nationals to apply for green cards.[15] In addition, community-based organizations launched campaigns to urge legal residents to become citizens in time to vote in the 2008 elections and to take the exam before announced changes to the naturalization test were implemented.[16] Further, there were apparent efforts to secure immigration status in response to more publicized immigration enforcement and comprehensive immigration reform debate in Congress. Other factors included a proposed rule requiring certain green card holders to replace their Permanent Resident Cards (Forms I-551) that lacked expira-

---

8   *Hereinafter* referred to as "legacy INS."

9   USCIS Annual Report 2007, pp. 10-11.

10  U.S. House Judiciary Committee Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law Hearing on *Naturalization Delays: Causes, Consequences and Solutions* (Jan. 17, 2008) (written testimony of Emilio T. Gonzalez, former USCIS Director, that in June, July, and August 2007, USCIS received over three million applications and petitions compared to the 1.8 million applications and petitions received during the same period in 2006), http://www.uscis.gov/files/testimony/testimony_ETG_17jan08.pdf (accessed May 26, 2008).

11  Id.

12  Id.

13  U.S. Senate Judiciary Committee Hearing on *Oversight of the Department of Homeland Security* (Apr. 2, 2008) (written testimony of DHS Secretary Michael Chertoff), http://www.dhs.gov/xnews/testimony/ testimony_1207231284950.shtm (accessed May 26, 2008); *see also* Statement by Emilio T. Gonzalez, former USCIS Director (Mar. 14, 2008). ("Individuals who filed for citizenship during the summer of 2007 can now anticipate an average processing time of 14-16 months for these applications. That's a marked improvement from the 16-18 months projection we announced in January."), http://www.uscis.gov/files/article/natz_processing_14Mar08.pdf (accessed May 26, 2008).

14  "Adjustment of the Immigration and Naturalization Benefit Application and Petition Fee Schedule," 72 Fed. Reg. 29851-29874 (May 30, 2007). For certain submissions, the new fees did not take effect until August 17, 2007. USCIS Update, *USCIS Announces Revised Processing Procedures for Adjustment of Status Applications* (July 17, 2007); http://www.uscis.gov/files/pressrelease/VisaBulletinUpdate17Jul07.pdf (accessed May 26, 2008).

15  Department of State Visa Bulletin, July 2007, http://travel.state.gov/visa/frvi/bulletin/bulletin_3258.html# (accessed Mar. 19, 2008).

16  *See generally* USCIS News Release, *USCIS Announces New Naturalization Test* (Sept. 27, 2007); http://www.uscis.gov/files/pressrelease/NatzTest_27sep07.pdf (accessed May 26, 2008).

tion dates,[17] and the extension of Temporary Protected Status (TPS) for certain nationalities in May and August 2007.[18]

The surge tested the agency's leadership, workforce, and strategic planning capabilities. The Ombudsman notes that USCIS personnel worked hard to provide timely and efficient services, while ensuring the integrity of processing, often with insufficient resources, antiquated information technology, and imperfect facilities. The Ombudsman also notes that many of the described pervasive and serious problems were further exposed by insufficient planning for the surge, as explained below. The consequences of the surge have led, in part, to the current state of USCIS and will drive USCIS operations and policy for months and years to come.

## B.  Ombudsman's Accomplishments

During the reporting period, the Ombudsman made two formal recommendations and numerous informal recommendations to USCIS. The recommendations sought to improve USCIS services by streamlining processes and ensuring adequate notice for customers of USCIS policies and procedures.

In the 2006 and 2007 Annual Reports[19] the Ombudsman discussed lengthy delays in security screening for immigration benefits, and made public the number of long pending FBI name check cases. USCIS took action to address some of these delays, after these Annual Reports were published, and Congress and the public expressed increased concern.

Since its inception, the Ombudsman has issued a total of 73 recommendations to USCIS, not including the 10 recommendations in this year's Annual Report; USCIS has answered 72 with one pending response in July. The agency has at least partially agreed with 63 of them. While full text versions of the recommendations and responses are available on the office website, the current Annual Report includes a tabular presentation of this information in summary form, in section IV of this Report, for ease of reference.

The Ombudsman also continued to devote considerable resources to assisting individuals and employers with case problems. As discussed further in section VI, "Case Problems," the Ombudsman received an average of almost 100 inquiries per week or approximately 4,632 case problems by U.S. mail or courier service, which represents an increase of 249 percent over last year (from 1,859 cases). This year, the Ombudsman tried to resolve 3,023 case problems with USCIS and sent direct responses to the inquirer for the remaining 1,609 case problems received. The Ombudsman also received over 5,000 emails during the reporting period.[20] As customers and stakeholders become more familiar with this office's services, the number of case problems continues to grow.

The Ombudsman continued a pilot public teleconference outreach series as a regular program on issues including delays in receipting applications, the family unification process for foreign spouses, and overall USCIS services. During the reporting period, the Ombudsman also made site visits to 48 USCIS facilities, including field offices, service centers, and other locations.[21] The purpose of these visits was to see firsthand the issues that individuals and employers encountered, identify systemic problems, and consult with USCIS field offices on proposed solutions. The Ombudsman held numerous meetings with representatives from community-based organizations, employer associations, and the immigration legal community. The Ombudsman also met with other federal government agency partners, including representatives from the Departments of State, Justice, and Labor to facilitate interagency coordination.

Finally, the Ombudsman's office underwent its first leadership transition in 2008 with Prakash Khatri departing in February and Michael Dougherty assuming the position of CIS Ombudsman in March.

---

17   "Application Process for Replacing Forms I-551 without an Expiration Date" 72 Fed. Reg. 46922-46930 (Aug. 22, 2007).

18   "Extension of the Designation of Honduras for Temporary Protected Status," 72 Fed. Reg. 29529 (May 29, 2007); "Extension of the Designation of Nicaragua for Temporary Protected Status," 72 Fed. Reg. 29534 (May 29, 2007); *see also* "Extension of the Designation of El Salvador for Temporary Protected Status," 72 Fed. Reg. 46649 (Aug. 21, 2007).

19   Ombudsman's Annual Reports 2006 and 2007, pp. 23-26 and 37-45, respectively.

20   The Ombudsman received these emails at *cisombudsman@dhs.gov*. The Ombudsman also receives emails at *cisombudsman.publicaffairs@ dhs.gov*, in connection with the office's public teleconferences, and at *cisombudsman.trends@dhs.gov*, to learn about systemic problems and suggestions for how to fix them.

21   *See* Appendix 4 for a complete list of facilities visited.

# II. Pervasive and Serious Problems

The Homeland Security Act, Section 452(c)(1)(B), states that the Ombudsman's report to the House and Senate Judiciary Committees shall include a "summary of the most pervasive and serious problems encountered by individuals and employers, including a description of the nature of such problems." This year's Annual Report details major problems that have impacted immigration benefits processing and initiatives designed to address them. This includes developments in FBI name check delays, causes of the new backlogs resulting from the 2007 summer surge of immigration applications, new application fees, continuing case management system problems and possible solutions, as well as customer and intra-agency communication developments.

## A. FBI Name Check Delays

During the reporting period, the FBI name check, one of several security screening tools used by USCIS, continued to significantly delay adjudication of immigration benefits for many customers. However, on February 4, 2008, USCIS issued a Memorandum stating that the agency would adjudicate green card and other selected applications if FBI name checks were pending in excess of 180 days and the applications were otherwise approvable.[22] Also during the reporting period, Congress provided additional funding to USCIS and the FBI for new positions to assist in completing name checks in a timely manner.

In the 2007 Annual Report,[23] the Ombudsman recommended that USCIS: reassess the value of the name check in its current format and establish a risk-based approach to screening for national security concerns; work with the FBI to provide the resources necessary to perform name checks in a timely manner; and provide greater transparency to customers by publishing monthly the number of long-pending FBI name check cases. The USCIS response to the 2007 Annual Report pre-dates the policy change discussed above. The response states,

> [T]hrough revisions to the name-check search criteria introduced via the [Memorandum of Agreement], both the FBI and the USCIS anticipate significant reductions in the pending caseload. . . . The third recommendation (providing monthly totals of long-pending name-check cases) has been implemented. Pertinent data is [sic] being shared and discussed with concerned agencies.[24]

USCIS took steps during the reporting period to address what has been one of the biggest obstacles to the delivery of immigration benefits. However, contrary to its assertion, USCIS still does not customarily make available to customers, or non-governmental stakeholders, the number of long-pending FBI name check cases.

### CASE PROBLEM*

An individual filed an application for a green card in November 2003, and filed for an Employment Authorization Document (EAD) in July 2007. In November 2007, the applicant contacted the Ombudsman for assistance. It was determined that the EAD had been approved, but that the green card application was still pending the FBI name check. The green card application was finally approved in April 2008.

---

22  USCIS Interoffice Memorandum, *Revised National Security Adjudication and Reporting Requirements* (Feb. 4, 2008); http://www.uscis.gov/files/pressrelease/DOC017.PDF (accessed May 26, 2008). Specifically: I-485 (Application to Register Permanent Residence or Adjust Status); I-601 (Application for Waiver of Ground of Inadmissibility); I-687 (Application for Status as a Temporary Resident Under Section 245A of the Immigration and Nationality Act (INA)); I-698 (Application to Adjust from Temporary to Permanent Resident Under Section 245A of Pub. L. No. 99-603, 100 Stat. 3359 (1986)). The Ombudsman does not comment on the security aspects of the new policy.

23  Ombudsman's Annual Report 2007, p. 45.

24  USCIS 2007 Annual Report Response, p. 4. The Ombudsman received USCIS' response on February 13, 2008.

---

\* *Case Problems are actual cases received in the Ombudsman's office.*

## Figure 1: Pending FBI Name Checks 2006–2008

| Age of Pending Response | Total Count (May 6, 2008) | Total Count (May 4, 2007) | Total Count (May 17, 2006) |
|---|---|---|---|
| < 3 months | 50,328 | 117,819 | 82,636 |
| 3 - 6 months | 34,453 | 55,749 | 33,450 |
| 6 - 9 months | 85,955 | 28,029 | 20,047 |
| 9 - 12 months | 24,947 | 20,825 | 16,845 |
| 12 - 15 months | 17,860 | 14,133 | 15,064 |
| 15 - 18 months | 13,489 | 13,931 | 10,636 |
| 18 - 21 months | 11,759 | 11,035 | 8,144 |
| 21 - 24 months | 13,102 | 12,398 | 8,325 |
| 24 - 27 months | 5,836 | 11,765 | 9,754 |
| 27 - 30 months | 4,461 | 6,600 | 4,435 |
| 30 - 33 months | 2,924 | 5,732 | 4,896 |
| >33 months | 4,829 | 31,144 | 21,570 |
| **Total Pending** | **269,943** | **329,160** | **235,802** |

\* As of May 6, 2008, USCIS had 1,728 cases pending 33-36 months, 1081 cases pending 36-39 months, 815 cases pending 39-42 months, 515 cases pending 42-45 months, 388 cases pending 45-48 months, 237 cases pending 48-51 months, 11 cases pending 51-54 months, and 54 cases pending more than 54 months.
Source: USCIS Name Check Aging Reports

## 1. Background

As of May 6, 2008, USCIS reported 269,943 FBI name check cases pending. Approximately 81 percent (219,615) have been pending more than 90 days, and approximately 28 percent (74,260) have been pending more than one year. As Figure 1 shows above, there are 59,217 fewer cases pending this year than last year. Also, there are 32,478 fewer cases pending more than one year. Approximately seven percent (18,050) of cases have been pending more than two years.[25]

In the 2007 Annual Report,[26] the Ombudsman discussed in detail the FBI name check process. Other types of background and security checks – *e.g.*, fingerprint checks, the Interagency Border Inspection Systems (IBIS) checks, and the Automated Biometric Identification System (IDENT) checks – return results within a few days, if not a few minutes.

The FBI provides information to USCIS regarding anyone who is the principal subject of an investigation or is a person referenced in an FBI file. USCIS adjudicators and the Fraud Detection and National Security (FDNS) unit use this information to determine if applicants are ineligible for benefits. The name checks are a fee-for-service that the FBI provides at USCIS' request. However, during the reporting period, USCIS officials stated that at the operator-to-operator level between USCIS and the FBI, the name checks may assist in ongoing law enforcement actions.

Once USCIS forwards records to the FBI for name checks, the process and the turnaround time for the checks are almost entirely outside of USCIS' control. Completion of the name check process may take considerable time because a manual review of FBI hardcopy files may be necessary.

## 2. Impact of Long-Pending FBI Name Checks on USCIS Customers and the Agency

FBI name check delays have had substantial consequences for USCIS customers (applicants, families, and employers) and the economy.

Examples of how legitimate customers suffer include:

- Loss of employment and employment opportunities where the position requires green card status or U.S. citizenship;
- Problems obtaining drivers' licenses;
- Inability to qualify for certain federal grants and funds;
- Limitations on the ability to purchase property;
- Difficulty obtaining credit and student loans;
- Disqualification from in-state tuition; and
- Delay in obtaining full citizenship rights, most notably the right to vote.

FBI name checks also have had enormous impact on USCIS, diverting resources from the primary mission of benefits adjudication. For example, there has been significant litigation, which may be increasing, concerning FBI name checks. USCIS

---

25  USCIS, "FBI Pending Name Check Aging Report" (May 6, 2008). It is important to note that USCIS does not include within its backlog calculation cases pending due to FBI name checks. There are 185,162 FBI name check cases pending more than six months that otherwise would be part of the USCIS backlog. *See generally* subsection B for a discussion of USCIS backlogs.

26  Ombudsman's Annual Report 2007, pp. 37-45.

attorneys and adjudicators spend considerable time responding to such litigation.[27]

## 3. Actions Taken to Improve the FBI Name Check Process

As discussed above, during the reporting period, USCIS changed its policy to provide for adjudications of green card and other applications where the FBI name check has been pending for more than 180 days and the application is otherwise approvable. Additionally, in October 2007, USCIS and the FBI entered into a Memorandum of Agreement (MOA) to limit the searches of FBI databases to avoid receiving hits that convey no relevant law enforcement or immigration eligibility information.

USCIS and the FBI also have devoted additional resources to conducting the name checks. In FY 2007 and FY 2008, USCIS has been in the process of transferring nearly $30 million in additional funds to the FBI used mainly to hire additional contract staff. This funding allowed the FBI to increase its contract staff from 38 to 250 personnel. Most of the improvements in name check processing times and the reductions in the backlogs have resulted from this increase in resources and personnel. It is estimated that these changes have cleared approximately 60,000 cases from the FBI name check backlog.

In an April 2, 2008 press release, USCIS announced a "joint plan to eliminate the backlog of name checks pending with the FBI. . . . USCIS and the FBI established a series of milestones prioritizing work based on the age of the pending name check."[28] The FBI has already eliminated all name check cases pending more than four years, according to the announcement.

Despite these developments, approximately 270,000 FBI name check cases remained pending as of May. Though details of the FBI name check program remain classified, the Ombudsman encourages USCIS to brief stakeholders and Congress openly and frequently about both the name check backlogs and the initiatives USCIS is considering and undertaking to address these delays, particularly as USCIS attempts to handle the latest surge in immigration applications.

Shortly after Congress established the Ombudsman's office, USCIS promised the imminent implementation of the Background Check System (BCS). This IT system would track the status of background and security checks for pending cases. In a December 2003 USCIS Background Checks briefing, USCIS indicated that this system would be deployed in FY 2004.[29] During the last reporting period, USCIS stated that the BCS was to be implemented in April 2007 with deployment beginning in May 2007. As of this writing, the BCS is yet to be deployed.

Currently, USCIS has limited capability to produce reports detailing the status of long-pending FBI name check cases, or to determine whether a new name check is for an individual who recently had one completed. In addition, USCIS systems do not automatically indicate when a delayed name check is complete and the case can be adjudicated.

> **BEST PRACTICE**
>
> The Miami District Office implemented the Management Information of Known Errors (MIKE) system in March 2006 to address prolonged delays relating to FBI name checks. Cases subject to name checks are sent from field offices to USCIS headquarters for submission to the FBI. If data from the field office contain errors, headquarters returns this information for the field office to correct (a time consuming process). The MIKE system provides quality assurance for the submission of such information. According to the Miami District Office, prior to implementation of the MIKE system, the majority of the cases pending FBI name check took longer than six months. Subsequent to implementation, no data submissions have been returned from headquarters to the Miami office, and only 10 percent take longer than six months.

---

27  Christopher Lee, *Applicants for Citizenship Take to the Courts to Force Action*, Washington Post, May 7, 2008. ("An increasing number of immigrants seeking U.S. citizenship are using legal action to force a decision from the perennially backlogged immigration office. . . . In fiscal 2005, applicants filed 370 such lawsuits . . . this year [they] are on a pace to surpass 5,200.") http://www.washingtonpost.com/wp-dyn/content/article/2008/05/06/AR2008050602603.html?nav=emailpage (accessed May 26, 2008).

28  USCIS Press Release, *USCIS and FBI Release Joint Plan to Eliminate Backlog of FBI Name Checks*, http://www.uscis.gov/files/article/NameCheck_2Apr08.pdf (accessed May 26, 2008).

29  USCIS Background Checks, at slide 21 (Dec. 2003).

# EXHIBIT 4

# U.S. Citizenship and Immigration Services

### REFUGEE, ASYLUM, AND INTERNATIONAL OPERATIONS DIRECTORATE ASYLUM DIVISION

### AFFIRMATIVE ASYLUM PROCEDURES MANUAL

### NOVEMBER 2007



- *Assessment to Grant* (Appendix 44)
- *Asylum Approval* letter (Appendix 17, 49, or 50)
- I-94 card, endorsed with asylum approval stamp (see Section IV.E below) that bears the date of asylum approval, signature, Asylum Office code, and office ID number of the adjudicating officer
- *Asylum and NACARA § 203 Background Identity and Security Checklist*(Appendix 1 of the Identity and Security Checks Procedures Manual)
- RAPS – FDEC of G1
- When updating "basis of the claim" section, enter the basis upon which the case is decided, rather than basis claimed by the applicant (if there is a difference).

  > For more information on CFP cases, see Section III.B.2.

  - If the claim is being granted based solely on coercive family planning (CFP) policies, place an "X" next to the CFP ground only.[1]
- I-589 – "FOR BCIS USE ONLY" section.  Asylum Office personnel complete the appropriate area(s) of this section, indicating a final approval, date, and Asylum Officer ID number.
- RAPS – GLET for service of decision letter

## 2.    Applicant Appears Ineligible for Asylum

> 8 C.F.R. 208.14(c)

### a.    Asylum Office Authority to Issue Decisions to Applicants who Appear Ineligible for Asylum

The Asylum Office's authority to issue decisions to individuals who are found ineligible for asylum is defined by regulation.  Because the authority of the Asylum Office varies depending on the individual's status, the type of decision prepared depends on the status of the individual at the time the decision is *issued* (mailed or personally served), not at the time of decision preparation or interview, if there is a difference.

Asylum Office Directors maintain the discretion to establish the most efficient workflow for the processing of decisions for individuals who appear ineligible for asylum provided that:

- the type of decision is appropriate under the regulations at the time it is *issued*; and
- In the absence of exceptional circumstances, asylum applications are processed in a manner consistent with established timeliness requirements and without unreasonable delay.

***See* Section III.N for special procedures governing parolees.**

### b.    Referral

The Asylum Office must refer to the Immigration Court for adjudication in removal proceedings an applicant who is ineligible to apply for or be granted asylum and appears inadmissible or deportable at the time the decision is issued.

The following is an outline of the documents and RAPS updates associated with a referral. Detailed instructions on how to prepare the documents can be found in Section IV, "*How To…*" of this manual.

> Check with local

- *Assessment to Refer* (Appendix 46)

---

[1] Previously, CFP cases had to await assignment of a final approval authorization number under a 1,000 per-year cap and were given a conditional grant until a number became available.  However, since the Real ID Act of 2005 lifted the cap, CFP cases, like all other asylum cases, may receive a final approval as soon as all required security checks are complete and allow for a final grant.  Nonetheless, it is important to record the basis of claim in RAPS as CFP, as the Asylum Program is still required to report to Congress on the number of CFP cases granted each year.

- Form I-213, *Record of Deportable/Inadmissible Alien*, if required
- Form I-862, *Notice to Appear* (NTA), or Form I-863, *Notice of Referral to Immigration Judge*
- *Referral Notice* (Appendices 51, 52, 53, 54 and 55)
- *Asylum and NACARA § 203 Background Identity and Security Checklist* (Appendix 1 *of the Identity and Security Checks Procedures Manual)*
- RAPS – FDEC of I1-I7, with a deport code of A1 if an NTA is to be issued, A5 if an I-863 is to be issued
    - When updating "basis of the claim" section, enter the basis upon which the case is decided, rather than basis claimed by the applicant (if there is a difference).  The RAPS screen allows entry of "NO," for no nexus, if applicant failed to establish nexus to one of the five protected grounds.
- RAPS – OSCG and OSCP screen to generate an NTA and Form I-213, if required
- I-589 -  "FOR BCIS USE ONLY" section. If the form does not contain a space for a referral, Asylum Office personnel write "referral," the Asylum Officer ID number, and the date of the decision.
- RAPS – OSSE for service of decision letter.

Asylum Office management about requirements for preparing Form I-213.

### c.    Notice of Intent to Deny (NOID)

The Asylum Office issues a denial of asylum to an applicant who is ineligible to apply for or be granted asylum and is maintaining valid immigrant, nonimmigrant, or Temporary Protected Status ("in-status") at the time the decision on the application is issued.  Prior to denial, the Asylum Office issues an in-status applicant a *NOID* (Appendix 45), providing him or her 10 days, plus 6 days for mailing (a total of 16 days), to rebut the reasons for the denial.  Any rebuttal is considered prior to making a final decision in the case.  An applicant found eligible for asylum after the rebuttal period is processed for approval as indicated above in this section.  An applicant found ineligible for asylum is processed as a denial or referral, as described in this section.

From time to time, Asylum Office personnel will encounter an applicant who nears and reaches the end of his or her  period of authorized stay during the processing of the asylum application.   As indicated in Section II.N.2, an Asylum Office Director maintains the discretion to establish procedures to ensure that the appropriate decision is prepared based on the applicant's status at the time the decision is issued, without undue delay.

For discussion of extensions of periods of nonimmigrant status, see Section III.G.

The following is an outline of the documents and RAPS updates associated with a *NOID*.  Detailed instructions on how to prepare the documents can be found in Section IV, "*How To…*" of this manual.

- *Notice of Intent to Deny (NOID)* (Appendix 45)
- RAPS – "Y" and expiration date entered in VIST
- RAPS – PDEC of D1-D7, deportation code A6.
    - When updating the "basis of the claim" section, enter the basis upon which the case is decided, rather than basis claimed by the applicant (if there is a difference).  The RAPS screen allows entry of "NO," for no nexus if applicant failed to establish nexus to one of the five protected grounds.
- I-589 – "FOR BCIS USE ONLY" section.  Asylum Office personnel write "NOID," the Asylum Officer ID number, and the date of the decision.
- RAPS – DINT for service of the NOID, RBUT for receipt of any rebuttal.

### d.    Denial

After a *NOID* and rebuttal period, the Asylum Office denies asylum to an applicant who is ineligible to apply for or be granted asylum and is maintaining valid immigrant, nonimmigrant, or Temporary Protected Status or has valid parole at the time the decision on the application is issued. If the applicant lost valid status between the issuance of the NOID and the date of issuance of the final decision, a referral is issued.

<div style="float:right">8 C.F.R. 208.14(c)</div>

The following is an outline of the documents and the Form I-589 and RAPS updates associated with a denial. Detailed instructions on how to prepare the documents can be found in Section IV, "*How To…*" of this manual.

- *Final Denial* (Appendices 56, 57, and 58)
- *Asylum and NACARA § 203 Background Identity and Security Checklist*(Appendix 1 of the *Identity and Security Checks Procedures Manual*)
- RAPS – "Y" entered in VIST
- RAPS – FDEC of D1-D7, deportation code A6.
    - When updating "basis of the claim" section, enter the basis upon which the case is decided, rather than basis claimed by the applicant (if there is a difference). The RAPS screen allows entry of "NO," for no nexus if applicant failed to establish nexus to one of the five protected grounds.
- I-589 – "FOR BCIS USE ONLY" section. If required by local Asylum Office policy, the AO completes the appropriate area(s) of this section, indicating a denial.
- RAPS –DENY for service of decision letter.

# O.    SAO REVIEWS FILE

## 1.    Case Review Checklist

Before a decision letter is served, the SAO reviews each case for procedural and substantive correctness and completeness, which includes the following:

- The applicant and the AO signed the I-589, and corrections have been made accurately and clearly.
- Assessment is clear, concise, complete, and correct.
- AO's notes contain the proper elements as described in the AOBTC Lesson Plan, *Interviewing Part II – Note-taking*.
- Decision Letter (e.g. *Referral Notice*, etc…) is correctly addressed to the applicant and any representative of record, accurately reflects the status of the case and lists all dependents.
- Address on the documents matches the address in RAPS.
- Information and dates are correct and consistent throughout (NTA, I-213, assessment, I-589, I-94).
- The AO signed the Form I-213, if required.
- NTA allegations/charges and the location of the Immigration Court are correct.
- Any *Record of Oath* is properly executed.
- *Asylum and NACARA § 203 Background Identity and Security Checklist* is present and completed in accordance with the decision being issued.
- Each A-file is in neat, record order, with no loose papers or unconsolidated folders attached.
- RAPS is properly updated.
- Copies of the relevant documents are in the dependent's A-file.

<div style="float:right; font-style:italic; font-size:small">SAOs must review the cases for completeness and correctness as outlined in this manual and appendices and in the various lesson plans of the AOBTC Basic Training Materials.</div>

<div style="float:right; font-size:small">See Section III.J.5 on record order.</div>

The AO finalizes the decision that the applicant is not eligible for asylum status. The type of decision documents the AO prepares depends upon the applicant's immigration status. *See* Section II.N.2, above, for guidance on which type of decision is prepared.

### b.    Rebuttal Overcomes Reasons for Denial

If the rebuttal overcomes the reasons for denial, and the applicant has established eligibility for asylum, the AO prepares a short memo to the file indicating the reasons for the decision and prepares the case for approval. This memo replaces the need to prepare an *Assessment to Grant*. *See* Section II.N.1, above, for guidance on which type of decision is prepared.

# III.  EXPANDED TOPICS

## A.  ADDRESS CHANGES

### 1.    Applicant's Obligation to Notify USCIS of a Change of Address

Aliens must notify USCIS of a change of address on Form AR-11, *Alien Change of Address,* within 10 days of such change, to the address given on the form. The applicant should also separately notify the Asylum Office if the applicant changes his or her address at any time during the pendency of an affirmative asylum claim. Notice of such change of address to the Asylum Office may take any of the following forms:

8 C.F.R. 265.1

- Electronic request after the applicant updates his or her address on www.uscis.gov.
- Submission of an original or photocopied Form AR-11, *Alien Change Of Address.*
- Written notice in letter form.
- In-person notification to an IIO/CR, documented in writing in the file and signed by the applicant.
- In-person notification to an AO during an asylum interview.

When an applicant submits an AR-11 to the address on the form in London, KY, the address is keyed into a local database and uploaded to RAPS nightly.

### 2.    Recording Change of Address

If the applicant sends the notice of change of address to a USCIS or DHS office other than an Asylum Office, that office forwards the change of address to the Asylum Office that has the physical file. Except as indicated in Section III.A.2.a below, *Change of Address Received on Interview Day*, and Section III.A.2.b below, *Change of Address Received After the Interview but Before Service of Decision*, below, a notice of change of address is processed as follows:

Asylum Office personnel update RAPS with the notice of change of address within two (2) business days of its receipt, and file it in the A-file within ten (10) days of receipt. To update RAPS, Asylum Office personnel:

- Check the Case History (CHIS) and Address History (AHIS) screens to see whether the address change is the most current. If it is **not** the most current, do not change the address in RAPS and route the correspondence to the file.
- **If there is no future interview date,** update the new address as indicated on the Address Change (MOVE) screen. Enter the effective date of the new address, which is the date the notice was dated by the applicant. If the applicant did not date the notice, use the date that the Asylum Office received the notice. If the new address falls under the jurisdiction of the same Asylum Office, route the correspondence to the file after updating RAPS, or schedule the applicant for an asylum interview using the Add Case (ADDC) command, depending upon local Asylum Office policy. If the address of the applicant falls under the jurisdiction of a different interview location, RAPS will prompt the user to transfer the case on the Case Transfer (TRAN) screen. Transfer the case in RAPS and, if necessary, transfer the A-file.
- **If there is a future interview date and an interview mailer has been sent notifying the applicant of an upcoming interview date,** follow the procedures in Section III.A.2.a, *Change of Address Received on the Interview Day*, starting at the second paragraph.
- **If there is a future interview date but no mailer has been sent**, cancel the interview (indicating the cancellation was caused by the applicant), update MOVE in RAPS and transfer the case to the Asylum Office having jurisdiction over the applicant's residence.
- **If the applicant failed to appear for a prior interview,** route the change of address to Asylum Office personnel who process no-show applications.

### a.      Change of Address Received on the Interview Day

An applicant may notify an IIO/CR or an AO of a change of address when he or she appears at the Asylum Office for the interview. If the applicant's new address remains within the jurisdiction of the Asylum Office that issued the *Interview Notice*, Asylum Office personnel update the Address Change (MOVE) screen in RAPS, using the day of the interview as the effective date of the change. An AO may proceed with the asylum interview.

If the applicant's new address falls under the jurisdiction of another Asylum Office, in most cases the applicant is not interviewed in the Asylum Office that issued the *Interview Notice* and the case is transferred to the Asylum Office having jurisdiction over the applicant's residence. Asylum Office Directors maintain discretion to establish criteria for determining which interviews will go forward and which will be cancelled for transfer of the file to the new Asylum Office having jurisdiction over the applicant's new residence. If the interview is to be cancelled for transfer to the Asylum Office having jurisdiction over the applicant's new address, Asylum Office personnel take the following steps:

- If the applicant is present, ask the applicant to complete and sign a *Case Reschedule History* (Appendix 9).
- Cancel the interview using the Remove Case from Schedule (REMC) command indicating the rescheduling is caused by the applicant.
- Utilizing the MOVE screen, type in the new address, transferring the case on the TRAN screen if appropriate.

### b.      Change of Address Received After the Interview but Before Service of Decision

Asylum Office personnel give the notice of a change of address to the AO or SAO processing the case, who checks the date the applicant submitted the notice. If the notice was submitted prior to the interview, the case is processed using the address that was verified by the applicant on the I-589 during the asylum interview, provided that address is different from the address on the notice. If the INTERVIEW DATE field does not contain an "N/S" and the CURR OFFICER field is blank, bring it to the attention of a supervisor so that he or she can find out why no action appears to have been taken on the asylum application. If the notice was submitted after the interview, Asylum Office personnel update the Address Change (MOVE) screen.

*See Section III.I.3 on the consequences of failing to appear at a pick-up appointment.*

If the new address falls under the jurisdiction of another Asylum Office, the Asylum Office where the interview was conducted retains jurisdiction over the case. The applicant is still obligated to appear at the Asylum Office if he or she was served a *Pick-Up Notice* at the time of the interview, although the Asylum Office Director maintains the discretion to cancel the pick-up appointment and mail out the decision. Any documents that were generated with the applicant's old address that have not been served must be regenerated to reflect the new address.

### c.    Change of Address Received After Service of a Decision

Asylum Office personnel update RAPS and route the evidence of the change of address to the file.

# B.    CATEGORIES OF CASES

## 1.    Children Filing as Principal Asylum Applicants

The Asylum Office Director must bring to the attention of HQASM any case of a child under the age of 18 who has applied for asylum as a principal and whose parent or legal guardian has not given express consent for the child to apply for asylum in the United States. HQASM and the USCIS Office of Chief Counsel will provide specific guidance on processing the case, if necessary, based on the particular circumstances of each child.

Special guidelines were developed by the INS Office of International Affairs for adjudicating asylum claims filed by individuals under the age of 18 who are applying for asylum independently, rather than as dependents. *See* Weiss, Jeffrey. Guidelines for Children's Asylum Claims, Memorandum to Asylum Officers, Immigration Officers and Headquarters Coordinators, 10 December 1998, 30p.

AOs must familiarize themselves with these guidelines in relation to guidance in Section II.J, *AO Conducts an Asylum Interview*, on conducting an asylum interview and the applicable AOBTC Basic Training Materials, including *Guidelines for Children's Asylum Claims* and *Interviewing Parts I – VI*. If Asylum Office personnel suspect that a child may have been trafficked into the U.S., they should consult Section III.B.14 below, *Trafficking Victims*.

## 2.    Coercive Family Planning (CFP)

In September 1996, the Illegal Immigration Reform and Responsibility Act (IIRIRA) amended the refugee definition to include persons who have been persecuted in the past or have a well-founded fear of future persecution on the basis of a forced abortion, involuntary sterilization, failure or refusal to undergo such a procedure, or for other resistance to CFP practices.

*The acronyms "CFP" and "CPC" (coercive population control) are both used within USCIS and are interchangeable.*

IIRIRA placed a cap of 1,000 on the number of individuals who were admitted as refugees or approved for asylum status on a claim relating to CFP practices during any fiscal year. Individuals who were found to be eligible for asylum based solely on their resistance to CFP, and whose security checks were complete and allowed for a final grant, were given a conditional grant, pending assignment of a final approval authorization number within the 1,000-per-year cap.

The Real ID Act of 2005, signed on May 11, 2005, lifted the annual numerical limitation on refugee admissions and grants of asylum based on resistance to CFP. Therefore, cases in which the applicant's sole basis of claim is CFP are treated in the same manner as all other asylum cases: those who are found to be eligible for asylum and whose security checks are complete and allow for a final grant are given an asylum approval.[2]

*See* Langlois, Joseph. The Effect of the "Real ID" Act on the Processing of Coercive Population Control (CPC) Cases, Memorandum for All Asylum Office Personnel, 16 June 2005

## 3.    Credible Fear-Screened Affirmative Asylum Applicants

An Asylum Office may encounter an affirmative asylum application from an individual who was screened in through the credible fear program, but whose charging document was not filed or was terminated by the IJ due to a technical fault. RAPS will display a "Y" in the "APSS" field on the CSTA screen if there is a record of an individual in the Asylum Pre-Screening System (APSS), the system used for adjudicating credible fear cases. If the "Y" appears, Asylum Office personnel check the APSS system to determine the outcome and status of the credible fear adjudication, and whether a charging document was issued but not filed with EOIR. Because such individuals are subject to the expedited removal/credible fear screening process, which has begun but was not completed due to a technical error, the Asylum Office will not take jurisdiction to hear their affirmative asylum claims. Instead, if the Asylum Office encounters such an individual, the Asylum Office will correct the technical error by preparing and filing the appropriate charging document. Asylum Office personnel take the following steps:

- If the A-file is not at the Asylum Office, order and wait for the A-file.
- Cancel or suspend the asylum interview, as appropriate.
- Notify the applicant that because he or she is subject to provisions of INA Section 235, the Asylum Office does not hear the affirmative asylum application, and that the application will be forwarded to the Immigration Court with jurisdiction over the applicant's residence. Explain this to the applicant in person if he or she is in the office and in all cases, issue to the applicant a *Notice of Institution of Removal Proceedings following Positive Credible Fear Screening* (Appendix 64)
- Prepare and serve the charging document, copying the I-589 for the IJ.
- Close the case in RAPS using close code C4, "IJ Jurisdiction."

## 4.    Deceased Applicants – DRAFT

If the Asylum Office discovers, prior to a final decision on an asylum application, that the principal applicant is deceased, Asylum Office personnel treat the asylum application as withdrawn and administratively close the case in RAPS under code C3. The case of a

---

[2] Previously, CFP cases had to await assignment of a final approval authorization number under the 1,000 per-year cap and were given a conditional grant until a number became available. However, since the Real ID Act of 2005 lifted the cap, CFP cases, like all other asylum cases, may receive a final approval as soon as all required security checks are complete and allow for a final grant. Nonetheless, it is important to record the basis of claim in RAPS as CFP, as the Asylum Program is still required to report to Congress on the number of CFP cases granted each year.

deceased principal applicant should not be deleted from RAPS.

If the case of a deceased principal applicant includes surviving dependents, Asylum Office personnel should follow the instructions in Section III.E.6.b, *Loss of Derivative Status by Marriage, Divorce, or Death of Principal Applicant*, by notifying any dependents of their ineligibility for continued classification as a dependent and by affording the dependent(s) the opportunity to file a new I-589 as a principal applicant.

If the Asylum Office discovers that a dependent is deceased, and is survived by the principal applicant, Asylum Office personnel should print the RAPS CSTA and I-589 screens for the dependent, place copies in both the principal's and dependent's A-files, remove the dependent from the principal's record in RAPS using the MOD REL function (PF9) on the principal's I-589 screen, and place a memo in the principal's and dependent's A-files, explaining that the dependent has been removed from the application because he or she is deceased.

## 5.    Deferred Enforced Departure (DED)

Deferred Enforced Departure (DED) grants certain qualified citizens and nationals of designated countries a temporary, discretionary, administrative protection from removal from the United States and eligibility for employment authorization for the period of time in which DED is authorized.  The President determines which countries will be designated based upon issues that may include, but are not limited to, ongoing civil strife, environmental disaster, or other extraordinary or temporary conditions.  The decision to grant DED is issued as an Executive Order or Presidential Memorandum.

Note: Please *see* below at Section III.B.7 for procedures governing GTMO/DED Haitians.

An alien does not need to apply for and be granted DED in order to benefit from its provisions.  Although DED status is automatic for qualified citizens and nationals of designated countries, some exceptions exist to eligibility under this program, including persons who have committed certain crimes, persons who are persecutors, and persons who have previously been deported, excluded or removed.

Because the decision to extend DED protection is made by the President, it is not a statutory provision under the Immigration and Nationality Act and as such, it is not considered an immigration "status."  DED is not considered to be a valid immigrant, nonimmigrant, or Temporary Protected Status under 8 C.F.R. 208.14(c)(2).  Therefore, individuals who are covered by DED and are not eligible for asylum must be referred to the Immigration Judge pursuant to 8 C.F.R. 208.14(c)(1) unless they otherwise have valid status or parole as described in 8 C.F.R. 208.14(c)(2) or (3).  DED does not prevent DHS from obtaining a removal order.  Rather, it prevents DHS from executing that order during the pendency of DED.  Therefore, Asylum Offices should proceed with referrals of such cases when asylum is not granted.

Langlois, Joseph E. Clarification of Procedures for Processing Applicants Covered by Deferred Enforced Departure (DED) who are Ineligible for Asylum, Memorandum to Asylum Office Directors, et al., 1 November 2001, 2p.

When referring a person who appears to be covered by DED, include a memorandum to the file addressed to the ICE Office of the Principal Legal Advisor (OPLA) and DRO indicating, "The individual who is the subject of this memorandum may be covered by Deferred Enforced Departure (DED)."

## 6.    Disabilities – Physical and Mental – DRAFT

Pursuant to Section 504 of the federal Rehabilitation Act of 1974, "[n]o qualified individual with a disability in the United States shall, by reason of his or her disability, be excluded from the participation in, be denied benefits of, or otherwise be subjected to discrimination under any program or activity conducted by any Executive agency."  Each federal agency must promulgate such regulations as are necessary to carry out this provision.  The implementing regulations for the Department of Homeland Security are found at 6 C.F.R. 15.  Pursuant to 6 C.F.R. 15.60, DHS offices "shall take appropriate steps to effectively communicate with applicants" and "shall furnish appropriate auxiliary aids where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a program or activity conducted by the Department."  Furthermore, in determining which auxiliary aids are appropriate, "the Department shall give primary consideration to the requests of the individual with a disability."

<div style="text-align: right">Pub.L. 93-112; 6 C.F.R. 15.30</div>

### a.    Hearing-Impaired Applicants

In the case of hearing-impaired asylum applicants, the aforementioned requirements under the Rehabilitation Act mandate that the Asylum Office provide for, and assume the cost of, a sign-language interpreter.  See Section II.J.4 above on working with an interpreter.

### b.    Mentally Incompetent Applicants

Instructions for dealing with mentally incompetent applicants are codified in various sections of Title 8 Code of Federal Regulations.  Although there is no definition of "mentally incompetent," 6 C.F.R. 15.3(d)(ii) defines "mental or psychological disorder" to include "mental retardation, organic brain syndrome, emotional or mental illness and specific learning disabilities."

8 C.F.R. 103.5a(c)(2)(i) provides that, in the event an inadmissible or deportable alien is confined to a mental institution or hospital, and is unable to understand the charges contained in the Notice to Appear, the NTA is to be served on the person in charge of the institution or hospital.  8 C.F.R. 103.5a(c)(2)(ii) provides that the NTA should also be served on the person with whom the mentally competent alien resides, whether or not the alien is confined to a mental institution or hospital.  Wherever possible, DHS must also serve the NTA on a near relative, guardian, committee, or friend.

Mentally incompetent applicants may also be unable to participate in all or part of their asylum interviews.  Although 8 C.F.R. 1240.4 relates specifically to removal proceedings before EOIR, the provision gives useful guidance for the conduct of asylum interviews.  When it is impracticable for the applicant to be present at his or her hearing because of mental incompetence, the attorney, legal representative, legal guardian, near relative, or friend who was served with a copy of the notice to appear is permitted to appear on behalf of the respondent.  If one of the aforementioned persons cannot reasonably be found or fails or refuses to appear, the custodian of the applicant shall be requested to appear on his or her behalf.  Similarly, if an applicant is unable, due to mental incompetence, to appear for, or testify during, his or her asylum interview, an individual, such as a close relative, should be permitted to testify on the applicant's behalf as long as certain criteria are met.  See Section II.J.12 above for further guidance.  If the applicant has an attorney or legal representative, that individual should also appear at the interview, but the attorney or representative should not be permitted to testify on the applicant's behalf.  Rather, his or her role should be limited to the provision of a closing statement at the end of the interview, as outlined in Section II.J.5 above and in the lesson plan, *Interviewing Part I: Overview of Nonadversarial Asylum Interview.*

When Asylum Office personnel become concerned that an applicant is not competent to testify, a Supervisory Asylum Officer must be notified and apprised of the reasons for concern. If the Supervisory Asylum Officer believes that there are reasonable grounds to question the competence of the applicant to provide testimony, Asylum Office personnel shall explain the procedures in Section II.J.12 above to a representative, family member or guardian accompanying the applicant to the Asylum Office, or to the asylum applicant him or herself, if practicable.

## 7.    Expeditious Processing Required

An Asylum Office Director may determine that it is in the best interest of USCIS to process an asylum application more expeditiously than usual because the case contains sensitive issues or there is special interest in the case. Examples include, but are not limited to, applicants who are being placed in witness protection programs, applicants who are providing information of national security concern to other agencies within the Federal Government, and cases in which there is a family member in jeopardy (e.g., spouse or child of an asylum applicant is in danger of harm in the country of claimed persecution).

Once the Director determines that the Asylum Office will expedite the processing of an asylum application, the following process occurs:

- The Director, Deputy Director, or Quality Assurance and Training Officer (QA/T) communicates the essential facts of the case to the HQASM Chief of the Training, Research and Quality Branch (TRAQ) at (202) 272-1616. HQASM/TRAQ alerts the USCIS Office of Public Affairs, if appropriate, and the DRL.
- Upon receipt of the application, Asylum Office personnel send the I-589 application and supporting documents to HQASM/TRAQ and the appropriate desk officer in DRL when appropriate. The DRL may decide to respond telephonically directly to the Asylum Office Director, with written confirmation to follow.
- An AO interviews the applicant as soon as practicable and prepares an *Assessment*. If the case is high profile, following the interview the Asylum Office sends to HQASM/TRAQ the I-589, supporting documentation, *Assessment*, interview notes, and any recommendation from DRL. Asylum Office personnel should scan the case documents and e-mail them to the "ASYLUM QA – AFFIRMATIVE" mailbox. If the materials cannot be scanned to a file size of less than 9MB, Asylum Office personnel send them to HQASM/TRAQ via DHL at 20 Massachusetts Ave., NW, Suite 3300, Washington, D.C. 20529. Asylum Office personnel should alert HQASM/TRAQ in advance of any case sent via DHL.
- HQASM/TRAQ responds within three days of receipt. Until then, the Asylum Office places the case on HOLD - HQ in RAPS.

## 8.    Legalization/Special Agricultural Workers (SAW)

Certain asylum applicants may have filed applications for adjustment of status pursuant to INA Section 210, the special agricultural workers (SAW) program, and INA Section 245A, the general legalization program, created by the Immigration Reform and Control Act of 1986 (IRCA).

Applicants who filed these special adjustment applications are commonly referred to as Legalization or SAW applicants. Aliens who applied for this benefit were given a 90-93M series A-number.